# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 1, 2008

Charles R. Fulbruge III
Clerk

No. 06-60030

MIKE FORADORI, ETC; ET AL

                                        Plaintiffs

MICHAEL FORADORI, JR.

                                        Plaintiff-Appellee

v.

GARIOUS L HARRIS, ETC; ET AL

                                        Defendants

CAPTAIN D'S, L.L.C.

                                        Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:03-CV-669

Before DAVIS, DENNIS, and PRADO, Circuit Judges.

DENNIS, Circuit Judge:

The principal issue in this case is whether the evidence supports a reasonable jury's findings that the defendant fast food restaurant operator's negligent failures to regulate, train, supervise, and control its off-duty employees on its premises were proximate causes of the plaintiff customer's quadriplegia. We conclude that it does. The jury reasonably could have found from the evidence that the restaurant operator negligently failed to train and regulate

its employees so as to prevent the undue risk of harm to customers by off-duty employees on its premises; that the manager in charge of the restaurant premises negligently failed to supervise and control a hostile off-duty employee who subjected the plaintiff customer to an altercation inside the restaurant; that the manager, rather than defusing the altercation, ordered the participants to take the angry disturbance outside; that the exeunt of protagonists, fellow employees and excited spectators led directly to the plaintiff being assaulted and severely injured by one of the employees in the restaurant parking lot; and that the negligence of the restaurant company and its manager in these respects were proximate causes of the plaintiff's injury and disability.

## I. Factual Background

The plaintiff, Michael Foradori, a 150-pound fifteen-year-old customer in a Captain D's restaurant in Tupelo, Mississippi was challenged to a fight by Al Cannon, an older teenage restaurant employee, who was off-duty but dressed in his restaurant uniform. Cannon was angry because he thought Foradori had been hitting on his girlfriend. As a group of young spectators gathered, Cannon's insistence that Foradori go outside to fight grew louder and sharper. The testimony is in dispute as to whether Garious Harris, another restaurant employee, as well as other employees, joined Cannon in confronting Foradori. After berating Foradori for fifteen to twenty minutes, Cannon emphasized his taunts by throwing a small object into Foradori's face or head. Foradori testified that he felt insulted, humiliated, and bullied during the incident; he said he did not want to fight but at the same time did not want to be seen as "chicken."

The evidence is in conflict as to whether Peggy King, the restaurant manager who was in the dining area near the cash registers, should have known

that the escalating altercation created the risk of a fight and bodily harm to Foradori. Jeremy Shells, a cook working in the kitchen further from the disturbance than Ms. King, testified that it was apparent that a fight was in the offing. He characterized the confrontation between Cannon and Foradori in the dining area as including "fussing and fighting," "loud voices . . . in an argument," "arguing inside the store," and "arguing on their way out of the store." He also testified that when the dispute moved outside, he followed because "they was already in the store arguing, so the next thing in my mind was, hey, they fixing to fight." On the other hand, Ms. King, the parent of a teenager, testified that the commotion was loud and distracting but that she thought it was only teenage horse-play. She did not investigate, intervene, or exercise her authority to control the off-duty workers and protect Foradori from the risk of harm. Instead, she called out to the noisy teenagers to take the disturbance outside. Cannon responded by walking out the front door with a group of teenagers and Foradori close behind. Foradori followed, he said, because he could no longer endure the humiliation, even though he did not want to fight. Garious Harris, still in his work uniform, clocked out and joined the crowd that flowed outside to be near the fight.

In the Captain D's parking lot, Cannon continued to verbally challenge the still reluctant Foradori. Ultimately, Cannon invited Foradori to show his mettle by joining him for a fight in the parking area of the business next door, which was situated at a lower level than Captain D's. At the end of the altercation, however, Foradori was still standing above on the edge of the Captain D's parking lot while Cannon taunted him from below. At this point, Harris, a football player over six feet tall and weighing nearly 250 pounds, sprinted toward Foradori from behind and struck him with his fist in the back of his neck.

3

Harris was running at full speed when he delivered the blow, described as a "hard punch" with a "balled-up fist" and "a punch like I never seen before." It immediately knocked Foradori unconscious, causing him to fall head first to the concrete surface below. Foradori's next memory was waking up in the hospital "after a couple of days." Foradori suffered a broken neck and severed spine and was diagnosed with pure C5 sensory loss, meaning that he has no sensation at all beneath his shoulders. His quadriplegia is permanent. According to the American Spinal Association scale of measurement, Foradori suffers from the most severe form of this disability.

## II. Proceedings in The District Court

Foradori brought suit in the Circuit Court of Lee County, Mississippi, seeking damages for injuries resulting from the tortious conduct of Captain D's, LLC and others. Defendant Captain D's removed the case to the United States District Court for the Northern District of Mississippi based on diversity of citizenship of the parties.[1]

After initially denying Captain D's motion for summary judgment, the district court reconsidered its ruling and granted summary judgment in respect to plaintiff's premises liability claims.

The case proceeded to a trial by jury on October 3, 2005, and at trial, plaintiff's counsel called a number of liability-fact witnesses. Foradori, Shells, and King testified to their versions of the events. According to the testimony of Foradori and Shells, the argument between Cannon and Foradori was

---

[1] All defendants other than Captain D's, including Garious Harris, were subsequently dismissed by agreement or summary judgment.

sufficiently loud and apparent to make it clear to any reasonably observant person in the restaurant, particularly a manager in charge, that a fight was brewing. Foradori testified that the argument, lasting "15 [to] 20 minutes," "got louder and louder as it went on," drew a crowd of spectators, and "was loud enough that [the Captain D's managers] could have heard it."[2]  Shells corroborated this description of the events, stating that even from his position in the kitchen he could hear the "loud voices . . . in an argument" "fussing and fighting" and that his immediate thought when the group began exiting the restaurant was that "they fixin to fight."  King testified that her only concern at the time was that what she thought was the "horse-play" of a group of disruptive teenagers was disturbing her cashiers.[3]  Foradori also called Jerry Rhodes, the general manager of the Captain D's restaurant, who admitted that under no circumstances should restaurant employees intimidate or assault customers; that managers, such as Ms. King, are obligated to take action to stop confrontations between customers and employees; and that failure to do so is a violation of restaurant and company policy.  Finally, Foradori called Phil Purcell, an attorney serving as Captain D's risk manager and corporate representative, who admitted that the Captain D's employees' conduct, if as alleged, violated

---

[2] [Plaintiff counsel] Q : All right.  Did you see Captain D's management in the store that night?
[Foradori] A: Yes, sir.
Q: Were they around the people who were harassing you?
A: They were close, I know they could have heard it.  It was loud enough they could have heard it.

[3] King recalled that Garious Harris was one of the individuals making noise, although she did not remember seeing Al Cannon and could not identify any other person in the gathering. The evidence indicates that Harris may have clocked out later, immediately before he assaulted Foradori in the parking lot.

Captain D's policy against on-premises customer assault; that an employee's assault on a customer likely warranted his discharge;[4] and that a manager who, knowing that an employee was acting disrespectfully to a customer, failed to intervene would violate company policy. In fact, Purcell conceded that if Foradori's injury occurred as Foradori and Shells described it, Captain D's should be responsible.[5]

At the close of Foradori's case, Captain D's rested without calling any witnesses. Captain D's then moved for a judgment as a matter of law dismissing all of Foradori's claims. The district court granted the motion in part, dismissing Foradori's action to hold Captain D's vicariously liable for Harris's assault upon Foradori because that intentional tort was outside the scope and course of Harris's employment. But the court also denied the motion in part, refusing to dismiss Forardori's claims based on Captain D's negligent failure to regulate, train, supervise and control its managers and employees, and submitted those negligence claims to the jury.

Following closing arguments, the district court charged the jury on the elements underlying Foradori's claims based on Captain D's alleged negligent failure to supervise, control, and train its employees in order to protect its

---

[4] Neither Cannon nor Harris was discharged after the incident.

[5] Q: Assuming a member of the public is confronted by your employees, drawn outside by your employees to fight, and to be watched by other employees, assume that the manager told them to go outside, and assume that one of your employees, who just seconds earlier was told to go outside, clocks out, severely injures that customer. You're responsible, aren't you?

A: Assuming all those statements, is the company responsible? To the extent of those assumptions, I would say yes.

6

customers from undue risk of harm. The district court noted that this court, in Williams v. United States Fidelity & Guaranty Co., 854 F.2d 106, 109 (5th Cir. 1988), indicated that Mississippi law places a duty on employers to control a servant's conduct outside the scope of employment but on the employer's premises comparable to the duty imposed by the Restatement (Second) of Torts § 317.[6] Accordingly, the district court followed the principles of § 317 in instructing the jury as follows:

> An employer is under a duty to exercise reasonable care to train and supervise its employees so as to prevent the employee from harming others or from so conducting himself as to create an unreasonable risk of bodily harm to others.
> The duty to supervise applies if the employee is upon the premises in possession of the employer and the employer knows or has reason to know that he has the ability to control his employee

---

[6] Restatement (Second) of Torts § 317 (1965) provides:

Duty of Master To Control Conduct Of Servant

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should know of the necessity and opportunity for exercising such control.

and knows or should know of the necessity and opportunity for exercising such control.[7]

Neither the plaintiff nor the defendant raised or preserved any objection for appeal as to this part of the district court's jury instructions.

The jury returned a verdict in favor of Foradori, awarding him $10 million for past, present, and future physical pain and suffering, mental anguish, and the loss of enjoyment in life; $1,581,884.41 for reasonable and necessary medical expenses already incurred; $8 million for the present value of the reasonable and necessary medical expenses reasonably likely to be incurred in the future; and $1,300,000 for the present value of loss of future earnings or earning capacity resulting from his disability.

The district court entered judgment on the verdict. Captain D's filed a combination motion renewing its motion for judgment as a matter of law and moving, alternatively, for a new trial or remittitur. The district court denied the motion in its entirety.

---

[7] The district court's instruction continued:

> The premises of the defendant Captain D's LLC includes all property owned, possessed, occupied or controlled by Captain D's LLC regardless of the holder of formal title to the property. If you find by a preponderance of the evidence that defendant Captain D's LLC failed to exercise due care in training its employees in this case with the proximate result that Michael Foradori was injured you shall find Captain D's to have been negligent
> Similarly, if you find by a preponderance of the evidence that the defendant Captain D's LLC failed to exercise due care in supervising its employees with the proximate result being Michael Foradori was injured, you shall find Captain D's to have been negligent.

Captian D's filed a timely notice of appeal, challenging the district court's denial of judgment as a matter of law and, alternatively, seeking a new trial or remittitur.

## III. Discussion

### A. District Court's Denial of Motion for Judgment as a Matter of Law

"We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." Int'l Ins. Co. v. RSR Corp., 426 F.3d 281, 296 (5th Cir. 2005) (citing Cozzo v. Tangipahoa Parish Council-President Gov't, 279 F.3d 273, 280 (5th Cir. 2002)); see also Lyrick Studios, Inc. v. Big Idea Prod., Inc., 420 F.3d 388, 391 (5th Cir. 2005); Serna v. City of San Antonio, 244 F.3d 479, 481 (5th Cir. 2001). But when a case is tried by a jury, a Rule 50(a) motion is a challenge to the legal sufficiency of the evidence.[8] Int'l Ins. Co., 426 F.3d at 296 (citing Brown v. Bryan County, 219 F.3d 450, 456 (5th Cir. 2000)). In resolving such challenges, we draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party. Id. (citing Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000)). Thus, we will reverse the denial of a Rule 50(a) motion only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict. Id. (citing Cousin v. Trans Union Corp., 246 F.3d 359, 366 (5th Cir. 2001)). A

---

[8] We apply this same 50(a) standard when we review a renewed motion for judgment as a matter of law under 50(b). See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 269 n.22 (5th Cir. 1980) (citing 9 Wright & Miller, Federal Practice and Procedure: Civil § 2524 (1971)); see also 9B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524 (2d ed. 2007).

jury verdict must be upheld unless "there is no legally sufficient evidentiary basis for a reasonable jury to find" as the jury did. Id. at 296-97 (citing Fed.R.Civ.P. 50(a)(1); Hiltgen v. Sumrall, 47 F.3d 695, 700 (5th Cir. 1995)).

This court has consistently applied this standard to show appropriate deference for the jury's determination. As we have explained:

> A jury may draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict. On appeal we are bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination. Even though we might have reached a different conclusion if we had been the trier of fact, we are not free to re-weigh the evidence or to re-evaluate credibility of witnesses. We must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable.

Id. (citing Hiltgen, 47 F.3d at 700); Rideau v. Parkem Indus. Serv., Inc., 917 F.2d 892, 897 (5th Cir. 1990)).

Federal diversity jurisdiction provides an alternative forum for the adjudication of state-created rights, but it does not carry with it generation of rules of substantive law. Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law. Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 426-427 (1996).

In this diversity case, the district court and this court must apply the substantive negligence law of Mississippi. See Erie v. Tompkins, 304 U.S. 64, 78-79 (1938); Am. Nat'l Gen. Ins. Co. v. Ryan, 274 F.3d 319, 328 (5th Cir.2001). In the absence of applicable statutes, the rules of common law negligence apply in Mississippi. See Chadwick v. Bush, 163 So. 823, 824 (Miss. 1935); Amy D.

Whitten & Deanne M. Mosley, Caught in the Crossfire: Employers' Liability for Workplace Violence, 70 Miss. L. J. 505, 517 (2000). Accordingly, Mississippi has long imposed on every person who undertakes an action a duty of reasonable care to protect against causing injury to others, see Dr. Pepper Bottling Co. of Miss. v. Bruner, 148 So. 2d 199, 201 (Miss. 1962), and while this duty requires that precautions be taken only against foreseeable risks, "in satisfying the requirement of foreseeability, a plaintiff is not required to prove that the exact injury sustained by the plaintiff was foreseeable; rather, it is enough to show that the plaintiff's injuries and damages fall within a particular kind or class of injury or harm which reasonably could be expected to flow from the defendant's negligence." Glover ex rel. Glover v. Jackson State Univ., 968 So. 2d 1267, 1278 (Miss. 2007) (citing City of Jackson v. Estate of Stewart ex rel. Womack, 908 So. 2d 703, 715 (Miss. 2005) and Gulledge v. Shaw, 880 So. 2d 288, 293 (Miss. 2004)).

Mississippi courts, like those of other states, have refined general negligence principles to require an owner of a business catering to the public to maintain a reasonably safe environment to protect business invitees from foreseeable harm by employees and third persons. "Mississippi imposes on business owners 'the duty to maintain the premises in a reasonably secure or safe condition' for business patrons . . . ." Am. Guar. & Liab. Ins. Co. v. 1906 Co., 273 F.3d 605, 613 (5th Cir. 2001) (citing Whitehead v. Food Max, Inc., 163 F.3d 265, 271 (5th Cir. 1998) and Lyle v. Mladinich, 584 So. 2d 397, 399 (Miss. 1991)). To fulfill this duty, businesses must "take reasonably necessary acts to guard against the predictable risk of assaults," id. (citing Whitehead, 163 F.3d at 271 (quoting Lyle, 584 So. 2d at 399)), and such a duty "includes the protection of

patrons or invitees from the foreseeable wrongful acts of employees and third persons on the premises." See id. at 613-14; see also L.T. ex rel. Hollins v. City of Jackson, 145 F. Supp. 2d 750, 759 (S.D. Miss. 2000) (citing Little by Little v. Bell, 719 So. 2d 757, 760 (Miss. 1998); Steele v. Inn of Vicksburg, Inc., 697 So. 2d 373, 377 (Miss. 1997)).

In addition to this broad duty owed to invitees, the Mississippi Supreme Court, in Tillman ex rel. Migues v. Singletary, 865 So. 2d 350, 353 (Miss. 2003), expressly quoted and adopted the principles of the Restatement (Second) of Agency § 213 stating that:

> [a] person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: (a) in giving improper or ambiguous orders or in failing to make proper regulations; or (b) in the employment of improper persons or instrumentalities in work involving risk or harm to others; (c) in the supervision of the activity; or (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Id. (citing and quoting Restatement (Second) of Agency § 213 (1958)).

In Tillman, the court held that a plaintiff swimmer, who was injured by a negligent powerboat driver, was entitled to a jury instruction under § 213 on the theory that the boat owner, who was in the boat at the time of the accident, had been negligent in his supervision of the driver. The boat owner was also the driver's employer, but at that time they were on a weekend outing that was not work-related.

12

The Tillman court approved the use of § 213 only as the basis of a jury instruction on negligently supervising an activity. However, because the court embraced all of § 213 with approval and the other negligence principles of § 213 are closely analogous to that of negligent supervision of an activity, we think the court would apply them as well in an appropriate case. In fact, prior to Tillman the court had already approved a theory of recovery based on an employer's negligent failure to train or regulate its employees. See Gamble ex rel. Gamble v. Dollar Gen. Corp., 852 So. 2d 5, 14 (Miss. 2003) (holding that "[b]ased on Dollar General's failure to show any training provided to [its employee], other than handing her a manual, it was proper to allow the jury to consider the issue of negligence for Dollar General's failure to train its employee").

The comments under § 213 deal with the applications of the rule to some of the specific situations which commonly involve a principal or master and indicate different ways in which a principal or master may be negligent. See Restatement (Second) of Agency § 213 cmt. a (1958). The comments most pertinent to the present case are:

> g. Inadequate regulations. A master is negligent if he fails to use care to provide such regulations as are reasonably necessary to prevent undue risk of harm to third persons or to other servants from the conduct of those working under him. One who engages in an enterprise is under a duty to anticipate and to guard against the human traits of his employees which unless regulated are likely to harm others. He is likewise required to make such reasonable regulations as the size or complexity of his business may require.

id. at cmt. g (citing Restatement (Second) of Torts § 317) (internal citation omitted); and

13

i. Acquiescence in tortious conduct. A master is subject to liability as the possessor of premises for conduct of a servant thereon, or in fact the conduct of anyone, to the continuance of which he consents after he knows or should know that such conduct contains an unreasonable risk of harm to licensees or those upon adjacent roads or premises. Failure on the part of the possessor of premises to prevent negligent conduct thereon by others does not necessarily make him responsible. If, however, being in control of the premises and of the persons acting by the fact that he is their principal or master, he does not object to dangerous conduct, his inaction may cause him to be liable to persons harmed by it. In such case, liability is based not merely upon the fact that he is the possessor of things which he is under a duty to prevent from harming another, which comes within the rule stated in Section 214, but upon the fact that by permitting another to use them in a dangerous manner he is aiding the dangerous conduct.

id. at § 213 cmt. i.

As the foregoing comments indicate, the principles of Restatement (Second) of Agency § 213 and Restatement (Second) of Torts § 317 are similar and interrelated. Section 317 of the Restatement (Second) of Torts provides:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
    (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
    (ii) is using a chattel of the master, and
(b) the master
    (i) knows or has reason to know that he has the ability to control his servant, and

14

(ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (1965). Thus, § 317 provides that a master is under a duty to use reasonable care to control the actions of his servant while the servant is acting outside the scope of his employment to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the servant is on the master's premises and the master knows or has reason to know that he has the ability to control his servant, and knows or should know of the necessity and opportunity for exercising such control.

In view of the Mississippi Supreme Court's adoption of the Restatement (Second) of Agency § 213 principles in Tillman, and their similarity and partial overlap with the Restatement (Second) of Torts § 317 principles, we conclude that the highest court of Mississippi would apply the similar principles of both of those Restatement sections in determining the questions of negligence and proximate cause in the present case. Our conclusion in this respect is bolstered by our circuit precedent in Williams, 854 F.2d at 109, recognizing that the Restatement (Second) of Torts § 317 sets the proper limits in Mississippi of an employer's duty to control a servant's conduct outside the scope and place of employment. Further, this view is consistent with the well established duty that Mississippi imposes upon a business proprietor to exercise reasonable care to protect a patron from reasonably foreseeable risks of harm by others on the business premises. See Lyle, 584 So. 2d at 399; Grisham v. John Q. Long V.F.W. Post, 519 So. 2d 413, 417 (Miss. 1988); Kelly v. Retzer & Retzer, Inc., 417 So. 2d 556, 560 (Miss. 1982); Joan Teshima, Annotation, Tavernkeeper's Liability to

Patron for Third Person's Assault, 43 A.L.R. 4th 281 (1986). Moreover, in related tort contexts the Mississippi Supreme Court has generally accepted and applied Restatement principles when relevant.[9] The parties essentially agree that these are the principles of law that the district court was required to follow in instructing the jury and deciding the motion for judgment as a matter of law and that this court must apply the same precepts in reviewing the district court's decision.[10]

### 1.

In this case, the district court, in denying Captain D's motion for judgment as a matter of law in respect to the negligent acts and omissions of its manager, Ms. King, in failing to control its employees on its premises, explained:

> [T]he burden [was] upon plaintiff to demonstrate that at least
> one Captain D's employee [other than Garious Harris], acting in the

---

[9] See, e.g., Glover, 968 So. 2d at 1282 (noting that the Mississippi Supreme Court has relied on the Restatement of Torts for its discussion of foreseeability of injury); Entrican v. Ming, 962 So. 2d 28, 35 (Miss. 2007) (applying Restatement (Second) of Torts § 448 to define "superseding cause"); Rein v. Benchmark Constr. Co., 865 So. 2d 1134, 1144-45 (Miss. 2004) (adopting Restatement (Second) of Torts § 435 for the proposition that the extent of an injury does not prevent it from being foreseeable); Farmer v. B&G Food Enter., Inc. 818 So. 2d 1154, 1157 (Miss. 2002) (applying Restatement (Second) of Torts § 345 in determining whether plaintiff held invitee status); Wal-Mart Stores, Inc. v. Johnson, 807 So. 2d 382, 388 (Miss. 2001) (citing Restatement (Second) of Torts § 448 to elucidate the scope of intervening cause); Hudson v. Courtesy Motors, Inc., 794 So. 2d 999, 1003 (Miss. 2001) (noting the Mississippi Supreme Court's reliance on Restatement (Second) of Torts § 332 in defining and classifying invitees).

[10] In its briefs, Captain D's generally embraces the principles of Restatement (Second) of Agency § 213 and Restatement (Second) of Torts § 317, although it tends to reshape or selectively employ them in its individual arguments. For example, Defendant relies heavily on the section of the Williams opinion that we based on Restatement § 317. See Appellants's Brief at 9, 16. Similarly, in suggesting jury instructions at trial, Captain D's offered an instruction based on Williams, though the district court rejected it and used a more complete summary of the relevant Restatement provision. Captain D's offered no objection to the court's instruction based on § 317.

scope of his or her employment, acted negligently in this case and that this negligence was a proximate cause of plaintiff's injuries. The jury found that plaintiff carried this burden of proof, and this conclusion was, in the court's view, supported by the evidence at trial. In particular, there was substantial testimony at trial suggesting that manager Peggy King acted negligently in this case, and Captain D's does not dispute that King's actions were taken in the course and scope of her employment as a Captain D's manager. In denying directed verdict as to plaintiff's negligence claims, the court wrote as follows:

> [T]estimony at trial indicated that the assault in this case did not arise "out of the blue," but, rather, was preceded by a period of verbal confrontation between Foradori and Al Cannon, a Captain D's employee. Foradori testified that this confrontation was a loud one which should have been overheard by Captain D's management personnel, and the testimony at trial indicated that restaurant chef Jeremy Shells, who was in the kitchen area, overheard the verbal confrontation in the dining area and went out to witness what he believed would be a fight. Moreover, Captain D's manager Peggy King admitted at trial that she heard the verbal exchanges between Foradori and Cannon, and she further testified that she ordered the young men to take their dispute outside. King maintained that she only felt that "horseplay" was taking place between the young men, but she conceded that she did not investigate the matter further to determine the true facts in this regard. In the court's view, the aforementioned facts create fact issues as to whether, unlike the sudden assault in Mays, Captain D's management either knew or, in the exercise of reasonable supervision should have known, of the confrontation which was brewing in their restaurant.

17

In light of the foregoing, there were clearly triable fact issues in this case as to whether King was negligent and whether that negligence was the proximate cause of plaintiff's injuries.

The jury apparently chose to believe Shells' testimony that he went outside the restaurant with the full expectation of seeing a fight. Specifically, Shells testified that:

> I seen a crowd of people go outside and they was already in the store arguing so the next thing in my mind was, hey, they fixing to fight. So I went out behind them.

Shells also testified that, prior to the young men going outside, he could hear "loud voices" in the restaurant which clearly indicated to him that an argument was taking place. With regard to Harris' assault on Foradori, Shells testified that while Cannon and Foradori were facing off outside:

> I turned around and Garious come out of nowhere running full speed and hit Michael Foradori in the back of the neck . . . that was a hard punch. I'm talking about a punch like I never seen before.

Assuming that the jury found this testimony to be credible, it could very reasonably have disbelieved King's self-serving testimony that she merely felt that innocent "horseplay" was taking place between Cannon and Foradori. Indeed, given that Shells, who was working in the food preparation area behind King, apparently managed to correctly perceive that a fight was brewing in the dining area a considerable distance away, King's self-serving testimony that she was unable to do so even though she was closer to the altercation can reasonably be viewed with skepticism.

Assuming that the jury made this very reasonable inference from the evidence, Captain D's arguments that Harris' intentional assault was a superseding cause as a matter of law likewise lacks merit. In the court's view, it is clearly foreseeable that a customer might receive injuries from engaging in a fight with an employee, and Shells' testimony could have led a reasonable juror to conclude

that King knew or should have known that her actions in ordering her employees outside (as well as her actions in not stopping the confrontation from brewing in the first place) would have resulted in a fight and possible injuries to Foradori. The mere fact that plaintiff's injuries were more serious than would generally be expected, and the fact that it was another employee who actually inflicted those injuries, make no difference as to the issue of foreseeability. Captain D's argued at trial that Shells' testimony was unreliable, but this was clearly an issue for the jury. This court considered Shells' testimony as to his reasons for going outside to be credible, in large part because young men typically do not rush outside to watch "horseplay" take place. Shells clearly left the restaurant for a reason, and his testimony that he did so to watch a fight seemed credible to this court. Shells' testimony was clearly damaging to Captain D's case, inasmuch as it cast doubt upon Captain D's argument that King had no reason to anticipate that a fight would occur.

The credibility of Shells' version of events was also enhanced by Peggy King's own testimony regarding her actions after the tragic incident in this case. The court found it extraordinary that King admitted that she made no inquiries whatsoever of her employees even after Foradori was left paralyzed by Harris' attack. King testified that she felt that it was the job of the police to investigate the incident, and this admission arguably speaks volumes regarding the level of discipline, and the degree of supervision, which existed between King and her employees. In the court's view, the jury could have reasonably concluded that a manager who admittedly failed to make basic inquiries after a fight involving grievous injuries to a customer would have been indifferent to whether that fight occurred in the first place. An inference of negligence on the part of King was also supported by the fact that three separate Captain D's employees under her supervision (i.e. Cannon, Harris and Shells) behaved in such a grossly inappropriate manner on the night in question. It is one thing for Captain D's to argue that the inappropriate actions of one employee were somehow an aberration, but the fact that three employees under King's supervision behaved in such an inappropriate manner reasonably supports a finding that a general

lack of supervision and discipline prevailed at this particular restaurant.

     In light of the foregoing, the court concludes that the evidence in this case not only supported the jury's finding that Captain D's was negligent, but that it did so strongly. Captain D's motion for JML and/or new trial based upon the sufficiency of the evidence will therefore be denied.

Considering the record in this case, we agree with the district court and conclude that the jury's verdict in respect to Captain D's liability for the negligent failure of its manager, Ms. King, to control its off-duty employees and take other precautions to prevent the foreseeable risk of harm to its customer, Foradori, is supported by legally sufficient evidence, which included the undisputed facts that Cannon loudly and angrily challenged Foradori to a fight in full view and hearing of Ms. King inside the restaurant for 15 to 20 minutes; that Ms. King heard and saw the angry confrontation, which she misinterpreted as horse-play, and ordered Cannon and Foradori to go outside without investigating, intervening or taking any precaution to protect Foradori; that Ms. King allowed a crowd including both employees and customers to follow the protagonists into the parking lot without taking any precautions, such as calling the police; and that as soon as Foradori reached the edge of the restaurant parking lot Garious Harris, a restaurant employee, assaulted him without warning from behind, knocking him unconscious and breaking his neck. In addition, the jury reasonably could have found that Ms. King, as Captain D's manager in charge of its employees and its premises, knew or should have known that Cannon, an off-duty employee, was creating an unreasonable risk of a fight and harm to Foradori; that she as the manager on duty had the ability to control the employee Cannon while he was on the premises, even though he

was off-duty; that she had the ability to control the other employees and to some extent the customers on the restaurant premises; that she aggravated the risk of bodily harm to Foradori, and created similar risks to other customers and employees, by causing the occupants to exit into the parking lot to witness or participate in the fight; that she knew or should have known of the necessity and the opportunity to exercise her ability to control everyone on the premises for the protection of Foradori as well as other customers and employees; and that had Ms. King exercised reasonable care and her ability to control Cannon and the other employees and occupants present, the assault that resulted in Foradori's injury and disability would not have occurred.

Captain D's argues that, as a matter of Mississippi law, it did not have a duty to supervise or control Cannon and Harris at the time of Foradori's injury simply because they were then off-duty and not acting in the scope of their employment, citing Williams, 854 F.2d 106, as its authority. This argument misreads Williams and the underlying Restatement (Second) of Torts § 317 principles upon which it is based. Under those principles, Captain D's had a duty to control its off-duty employees, such as Cannon, Harris, Shells and perhaps others, so as to protect patrons like Foradori from any foreseeable unreasonable risk of harm created by those employees, because those employees' conduct occurred on Captain D's premises, and the jury reasonably could have found that Captain D's manager knew or had reason to know that she had the ability to control them, and knew or should have known of the necessity and opportunity for exercising such control. On distinguishable facts, Williams held only that the employer in that case had no duty under the § 317 principles to control the

21

conduct of an employee off its premises who was not acting in the course of his employment when he injured the plaintiff. See Williams, 854 F.2d at 109.

Captain D's also argues that it owed no duty to protect Foradori from Harris's assault because it had no reason to know that Harris had any propensity for that type of conduct. The argument is not relevant to this case. Foradori's action is based on Captain D's negligent failure to regulate and train as well as control and supervise its employees whom it knew or should have known were creating an unreasonable risk of harm to its patron on its premises.[11] Foradori did not pursue an action against Captain D's for negligently hiring or retaining Harris. Under a negligent hiring action Foradori would have had to show that Captain D's had reason to believe that an undue risk of harm would exist because of its employment of Harris due to his dangerous propensity. But the showing of a dangerous propensity of an employee is not an essential element of the action based on the employer's negligent failure to control or supervise its employee whom it knows or should know to be engaging in conduct creating an unreasonable risk of harm to customers or others on its premises.[12]

Captain D's other arguments on this issue are equally without merit. They are simply attempts to shoehorn this case into the inapposite mold of a negligent

---

[11] See Restatement (Second) of Agency § 213 (1958); Restatement (Second) of Torts § 317 (1965); see also Restatement (Second) of Agency § 213 cmt. i (1958) ("A master is subject to liability as the possessor of premises for conduct of a servant thereon, or in fact the conduct of anyone, to the continuance of which he consents after he knows or should know that such conduct contains an unreasonable risk of harm to licensees or those upon adjacent roads or premises.").

[12] See Restatement (Second) of Agency § 213 (1958); Restatement (Second) of Torts § 317 (1965); see also Tillman, 865 So. 2d at 353.

hiring case or other cases distinguishable on their facts, along with reprises of its unsuccessful closing argument to the jury on the facts of this case.

2.

We also conclude that the district court properly denied Captain D's motion for judgment as a matter of law in respect to its negligent failure to train its managers and employees and inculcate in them the discipline of compliance with work rules. The district court stated:

> [T]he evidence in this case appears to establish a widespread failure among multiple Captain D's employees to behave in an appropriate manner in this case. Obviously, it is not proper behavior for a Captain D's employee such as Cannon, off-duty or not, to approach a customer on restaurant premises in a hostile manner and to encourage him to fight. The fact that Cannon apparently felt comfortable in behaving in such an improper manner on restaurant premises raises troubling questions regarding the level of training, supervision and discipline which existed at the Captain D's franchise in question. The fact that yet another employee - Harris-apparently felt comfortable in violently assaulting a customer on or near restaurant premises strengthens the court's conclusions in this regard. Finally, the fact that a restaurant chef's instinctive reaction upon learning of the fight was to go witness the altercation rather than break it up or notify management strongly supports a conclusion that there was a general failure on the part of Captain D's to properly supervise and train their employees at this particular franchise.
>
> It seems very likely that Captain D's management would have eventually learned of Harris' violent assault on Foradori, which occurred during business hours just outside the restaurant. The fact that Harris nevertheless elected to commit this assault raises questions in this court's mind as to whether Captain D's management had adequately informed Harris of the adverse consequences which would result if he behaved in a violent manner

23

towards a customer. The court's skepticism in this regard is strengthened by the fact that King testified that, even after Foradori was injured, she never directly asked Harris whether he had assaulted Foradori. Indeed, King testified that she never interviewed any of her employees about the accident.

Considered as a whole, King's testimony at trial appeared to reflect a rather passive managerial approach which, in the court's view, may well have contributed to the tragic injuries suffered by Foradori. The court therefore declines to dismiss plaintiff's negligent training and supervision claims against Captain D's, although it will, as stated previously, grant defendant's motion to dismiss plaintiff's vicarious liability claims based upon Harris' intentional assault.

After reviewing the record, we conclude that the district court correctly analyzed the evidence and applied Rule 50, not simply for the district court's stated reasons,[13] but also because of additional legally sufficient evidence in the record from which the jury reasonably could have found that Captain D's failed to take reasonable steps to train and discipline its employees to take reasonable precautions to control and defuse customer-related altercations on its premises. The evidence was undisputed that, although Captain D's had work rules and manuals addressing this subject, it failed to adequately train the managers and employees to comply with them in this case. Ms. King, the manager on duty in the restaurant dining room at the time of the incident, testified that although she "was given some oral things on disruption" she did not know what to do when an altercation occurred but would have to go ask her supervisor. As a consequence, she negligently failed to recognize or address the need to take reasonable precautions to protect Foradori from the unreasonable risk of bodily

---

[13] See Ellis v. Weasler Eng'g Inc., 258 F.3d 326, 338 (5th Cir. 2001).

harm created by employees on the premises. Ms. King's supervisor, Mr. Ferguson, who was on-duty but absent from the dining room at the time, stated he believed there were rules regarding the misconduct of employees and customers but that he did "not specifically" know what they were. Mr. Shells, the cook on duty, testified that he was never "[provided] a manual of rules and regulations that [he] should follow," "[instructions on] any rules or regulations on how [he] should treat customers," or "about how to handle a dispute between an employee and a customer." Mr. Rhodes, Captain D's general manager, who also was not present when Fordori was injured, admitted he was not aware whether Captain D's had guidelines for handling arguments or disturbances in the restaurant: "I don't think we have anything in writing for handling a disturbance. It could be. We've got books and books and books of policy and they change all the time." Rhodes testified that he "never walked . . . Peggy King through how to handle an incident involving an employee who was threatening or intimidating a customer" and did not prepare the other store managers for such a situation. Nonetheless, Rhodes stated that "if management didn't teach the rules and regulations [to employees]" that would constitute a "violation of Captain D's policy."

Under the Restatement (Second) of Agency § 213 negligence principles that we have concluded the Mississippi Supreme Court would apply, an employer who engages in an enterprise is under a duty to anticipate and to guard against the reasonably expected human traits and episodes of its employees within its industry to prevent undue risk of harm to third persons or to other employees; and is likewise required to make such reasonable regulations as the size or complexity of its business may require. See Tillman, 865 So. 2d at 353 (quoting with approval and applying § 213). Further, in

25

Gamble, the Mississippi Supreme Court affirmed a jury verdict for a plaintiff customer of a department store based on evidence that a store employee followed her into the parking area, accused her of shoplifting, and grabbed her underwear. See Gamble, 852 So. 2d at 14. The court held that it was proper to allow the jury to consider the issue of the employer's negligent failure to train without the need of expert testimony based on evidence that the store failed to provide any training other than handing the employee a manual. Id.

In light of the foregoing legal principles and evidence, there was a legally sufficient evidentiary basis for the jury to find that Captain D's actually anticipated or should have expected that angry confrontations would arise occasionally between a customer and employees or other customers on its premises; that Captain D's therefore had a duty to take reasonable precautions to train its managers and employees to deal with such situations and attempt to prevent them from escalating into unreasonable risks of bodily harm to customers or employees; that Captain D's negligently failed to provide reasonable training and regulation; and that if Captain D's had taken reasonable precautions the injury to its customer, Foradori, in this case would not have occurred.

Captain D's simply ignores the testimony of its managers and employees and argues that the only evidence presented in support of plaintiff's claim that it negligently failed to train its managers and employees was the expert testimony of Stuart Feigenbaum, who defendant contends was not qualified to testify to industry training practices. We disagree. As the preceding discussion of the evidence demonstrates, even without the expert's testimony, the combined testimony of Captain D's managers and employees provided a more than

sufficient basis for the jury's finding that the defendant failed to satisfy its duty to train and regulate its employees.

3.

Finally, the district court, in rejecting Captain D's argument that Harris' intentional assault was the superseding and sole proximate cause of Foradori's injury, reasoned:

> Captain D's arguments that Harris' intentional assault was a superseding cause as a matter of law likewise lacks merit. In the court's view, it is clearly foreseeable that a customer might receive injuries from engaging in a fight with an employee, and Shells' testimony could have led a reasonable juror to conclude that King knew or should have known that her actions in ordering her employees outside (as well as her actions in not stopping the confrontation from brewing in the first place) would have resulted in a fight and possible injuries to Foradori. The mere fact that plaintiff's injuries were more serious than would generally be expected, and the fact that it was another employee who actually inflicted those injuries, make no difference as to the issue of foreseeability. Captain D's argued at trial that Shells' testimony was unreliable, but this was clearly an issue for the jury. This court considered Shells' testimony as to his reasons for going outside to be credible, in large part because young men typically do not rush outside to watch "horseplay" take place. Shells clearly left the restaurant for a reason, and his testimony that he did so to watch a fight seemed credible to this court. Shells' testimony was clearly damaging to Captain D's case, inasmuch as it cast doubt upon Captain D's argument that King had no reason to anticipate that a fight would occur.

Mississippi law has long held that a cause of injury is not superseding if it is foreseeable.[14]   See, e.g., Glover, 968 So. 2d at 1279-80 ("where the intervening cause of injury was foreseeable, it cannot supercede the liability of the defendant"); O'Cain v. Harvey Freeman & Sons, Inc. of Miss., 603 So. 2d 824, 830 (Miss. 1991) ("[A]n independent intervening cause is one that could not have been reasonably foreseen by the defendant while exercising due care"); Canton Broiler Farms, Inc. v. Warren, 214 So. 2d 671, 676-77 (Miss. 1968) ("[I]f foreseeable, the subsequent negligence is not independent and intervening, but is concurrent with the prior negligence."); Meridian Hatcheries Inc. v. Troutman, 93 So. 2d 472, 476 (Miss. 1957) ("where the act of a third party, even if it is negligent, intervenes between the original negligence of defendant and the injury, there is proximate cause if, under the circumstances, an ordinarily prudent man could or should have anticipated that such intervening act, or a

---

[14] This principle of Mississippi law conforms with  the Restatement (Second) of Torts § 448 (1965), which states:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

Restatement (Second) of Torts § 448 (1965).

In fact, the Mississippi Supreme Court has endorsed Restatement § 448.  See Wal-Mart Stores, Inc. v. Johnson, 807 So. 2d 382, 388 (Miss. 2001) (relying on Restatement (Second) of Torts § 448 for the principle that "intervening cause" typically refers to unforeseeable acts of third parties); Touche Ross & Co. v. Commercial Union Ins. Co., 514 So. 2d 315, 324 (Miss. 1987) (quoting Restatement (Second) of Torts § 448 in full).

similar intervening act, would occur."); Oliver Bus Lines v. Skaggs, 164 So. 9, 12 (1935) ("an independent intervening cause is one that could not have been reasonably foreseen by the defendant while exercising due care"). As the Mississippi Supreme Court has recently confirmed, even a criminal act by a third party is not a superseding cause if it was foreseeable. See Glover, 968 So. 2d at 1279-80 (finding that a rape was not a superseding cause of injury when it was a reasonably foreseeable consequence of defendant's negligence).

"[I]n satisfying the requirement of foreseeability, a plaintiff is not required to prove that the exact injury sustained by the plaintiff was foreseeable; rather, it is enough to show that the plaintiff's injuries and damages fall within a particular kind or class of injury or harm which reasonably could be expected to flow from the defendant's negligence." See Glover, 968 So. 2d at 1278-79 (concluding that "although the specific harm of forcible rape may not have been contemplated by [defendant]" it was foreseeable because it fell within the class of acts that might occur as a result of defendant's negligence); Canton Broiler Farms, 214 So. 2d at 677 (holding that a car accident arising out of unique and improbable facts was foreseeable because: "[i]t seems clear, of course, that no mortal could foresee that which happened. The real question is, could the defendant reasonably foresee that some accident and injury would probably result from his [negligence]"); id. ("There are other intervening causes which could scarcely have been contemplated by any reasonable man in the place of the defendant at the time of his conduct, but which are nevertheless to be regarded as normal incidents of the risks he has created.") (quoting Prosser, Torts § 51 at 314 (3d ed. 1964));

Whether a cause of injury is foreseeable is a question for the jury. See O'Cain, 603 So. 2d at 830 ("the question of superseding intervening cause is so inextricably tied to causation, it is difficult to imagine a circumstance where such issue would not be one for the trier of fact.").

Applying these principles, we conclude that the district court correctly denied Captain D's motion for judgment as a matter of law on the superseding cause issue. In light of the evidence, the jury reasonably could have found that an assault and battery upon Foradori by one or more of a numerous class of third persons became foreseeable when, after the lengthy dining-area altercation between Cannon and Foradori, the manager in charge, King, relinquished her ability and duty to control the agitated employees and customers by ordering them to go outside.[15] Thus, the jury similarly could have found that it was not unforeseeable that Foradori would be harmed by any number of hazards posed that night by the turbulent crowd of teenagers in the Captain D's parking lot; and that the assault on Foradori by Harris fell within the particular kind or class of injury or harm which reasonably could be expected to flow from the

[15] Applying the Restatement (Second) of Torts § 448, as endorsed by the Mississippi Supreme Court, other jurisdictions have found third party assaults foreseeable in factually similar situations. For example, in City of Birmingham v. Benson, 631 So. 2d 902, 906 (Ala. 1993), the Alabama Supreme Court found that when a city police officer, on security guard detail at a bar, was aware of the likelihood of a fight between two groups of teenagers and escorted the teens outside but returned inside stating "I don't care what you do," a criminal assault by one group on another resulting in a teenager's death was not a superseding cause sufficient to relieve the city from liability. Id. at 906. In Benson, the police officer, similar to Ms. King, had a duty to protect patrons but abdicated that duty by escorting belligerent parties outside and abandoning them there. Id. Just as the causes of the resulting injuries in Benson, viz., a teen being dragged from his car, viciously beaten by a group of 15 youths, and then inadvertently runover, were of the kind that reasonably could be expected to flow from the officer's negligence, id., Harris's assault on Foradori was within the particular class of injury or harm which was a reasonably foreseeable consequence of Ms. King's failures to quell the impending fight and control the restaurant's employees and business invitees.

restaurant manager's negligent failure to control and supervise its employees and customers on its premises as well as from Captain D's negligent failure to train and regulate its managers and employees in respect to altercations on its property.

## B. Captain D's Motion for a New Trial

### 1. Verdict of liability against the weight of the evidence

Defendant protests that the jury's verdict on liability was contrary to the great weight of the evidence and thus a new trial is warranted. Our review of the district court's denial of a motion for a new trial is more deferential than our review of a motion for judgment as a matter of law. We will reverse the trial court's denial of a motion for a new trial only when there is a clear showing of an abuse of discretion. See Hiltgen, 47 F.3d at 703; Dawsey v. Olin Corp., 782 F.2d 1254, 1261 (5th Cir. 1986). To show an abuse of discretion in this respect, the defendant must show an absolute absence of evidence to support the jury's verdict. Whitehead, 163 F.3d at 269; Hiltgen, 47 F.3d at 703; Dawsey, 782 F.2d at 1262. Because we have already concluded that the jury's verdict was supported by the evidence in reviewing the district court's denial of judgment as a matter of law, we necessarily find that there was no abuse of discretion in its denying the motion for a new trial on liability.

### 2. New trial or remittitur of excessive damages

After a full trial on liability and damages, the jury returned a verdict for Foradori and awarded him $10 million for past, present, and future physical pain and suffering, mental anguish, and the loss of enjoyment in life; $1,581,884.41 for reasonable and necessary medical expenses already incurred;

31

$8 million for the present value of the reasonable and necessary medical expenses likely to be incurred in the future; and $1,300,000 for the present value of loss of future earnings or earning capacity resulting from his disability.

Alternatively to its motion for a judgment as a matter of law, Defendant moved for a new trial or remittitur. The district court denied the motion as to all awards. Defendant attacks as excessive the $10 million award for pain, suffering and loss of quality of life.[16]

a.

The Supreme Court in Gasperini, 518 U.S. at 419, 434, held that, in an action based on state law but tried in federal court by reason of diversity of citizenship, a district court must apply a new trial or remittitur standard according to the state's law controlling jury awards for excessiveness or inadequacy,[17] and appellate control of the district court's ruling is limited to review for "abuse of discretion." "Within the federal system, practical reasons combine with Seventh Amendment constraints to lodge in the district court, not the court of appeals, primary responsibility for application of [the state's new trial or remittutur standard]. Trial judges have the 'unique opportunity to consider the evidence in the living courtroom context,' while appellate judges see only the 'cold paper record.'" Id. at 438 (internal citation omitted). "In light of Erie's doctrine, the federal appeals court must be guided by the damage-control standard state law supplies, but as the Second Circuit itself has said: 'If we reverse, it must be because of an abuse of discretion...The very nature of the

---

[16] Defendant challenges the other awards on the basis of alleged prejudicial trial errors.

[17] "Federal diversity jurisdiction provides an alternative forum for the adjudication of state-created rights, but it does not carry with it generation of rules of substantive law." Gasperini, 518 U.S. at 426.

problem counsels restraint...We must give the benefit of every doubt to the judgment of the trial judge.'" Id. at 438-439 (citing Dagnello v. Long Island R. Co., 289 F.2d 797, 806 (2d Cir. 1961)) (footnote omitted).

The Mississippi statutory standard for granting a new trial or remittitur provides:

> The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.

Miss. Code Ann. § 11-1-55 (emphasis added)

Therefore, in accordance with Gasperini, we must review the district court's decision in applying the foregoing Mississippi new trial/remittitur standard to the evidence in this case to determine whether the district court abused its discretion.  In doing so, we may not substitute our own application of Mississippi's new trial/remittitur rule for the district court's, and we may not generate or apply our own appellate review rules in lieu of simply performing a review for abuse of discretion.[18]

---

[18]  See Consorti v. Armstrong World Indus., Inc., 103 F.3d 2, 4 (2nd Cir. 1996):

b.

At trial Foradori and his examining physician, Dr. Howard Katz, an expert in physical medicine and spinal cord injuries, testified describing the effects of Foradori's injury in respect to his pain, suffering, mental anguish, and loss of quality and enjoyment of life. According to their undisputed testimony, Foradori is essentially paralyzed from the neck down. He can feel his neck and the top of his shoulders, and he has some sensation "coming down his lateral upper arms about halfway down." Below that, Foradori has no sensation whatsoever. Using his upper arm, he can bend his elbow but cannot straighten it; he must rely on gravity to do so. His shoulder is similar; he is able to generate slight movements up, forward, or backward and must rely on gravity for the rest. Foradori can use these shoulder movements to operate his electric wheelchair, but he has no control over his hands or wrists. He is unable to sit up on his own and cannot

---

Review of Gasperini in the Supreme Court focused primarily on two questions: First, whether state or federal law governs the issue of the excessiveness of a jury award in a diversity case; and second, whether remittitur is beyond the power of a federal appellate court sitting in diversity because the Seventh Amendment commands that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law" (a question which had not been raised below).

As to the first question, the Supreme Court affirmed our ruling that state law governs. On the second question, the Court ruled that "[N]othing in the Seventh Amendment ... precludes appellate review of the trial judge's denial of a motion to set aside [a jury verdict] as excessive." 518 U.S. at 436, (quoting Grunenthal v. Long Island R. Co., 393 U.S. 156, 164 (1968) (Stewart, J., dissenting) (alterations in original)). The Court emphasized, however, that even in a diversity case the proper distribution of functions between the trial court and the court of appeals is a matter of federal law. In the federal system, "the district court is to determine whether the jury's verdict is within the confines set by state law" and the "court of appeals should then review the district court's determination under an abuse-of-discretion standard." 518 U.S. at 436 (quoting Browning-Ferris Industries v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989)).

remain upright unless strapped in a chair. Foradori is unable to feed himself, despite his attempts to use specially designed devices; to eat he relies on others to "take a fork or a spoon and dip it in food and put it in [his] mouth." Similarly, he is unable to wash or dress himself.

Despite the paralysis of Foradori's arms and legs, he suffers from spasms, commonly associated with spinal cord injury, in those extremities. To control these spasms, he required the surgical insertion of a Baclofen pump. This procedure involved inserting a "tube into a catheter into the spinal column into the epidural space" as well as placing a pump under the skin. The pump must be refilled every three months and replaced every five years.

Foradori's bodily functions are deeply compromised and require extensive external manipulation. He suffers from a "neurogenic bladder," meaning he has no bladder control. This condition leads to bladder spasms which can combine to create either uncontrolled urination or improper and unhealthy increases in bladder pressure. To manage this condition, Foradori requires a catheter, but because Foradori, like most spinal cord injury sufferers, cannot rely on a condom catheter to stay on his penis, he must use an indwelling catheter. Foradori describes the device as something "inserted into my private, going all the way to my bladder, then they have to blow up a balloon to keep it in and urine passes through the catheter to a bag." To function, this must remain attached to Foradori at all times, channeling the urine out of view to a black bag behind the leg rest of Foradori's wheelchair.

Dr. Katz describes Foradori's indwelling catheter, as "the worst possible choice for management of a spinal cord injury bladder" because "100 percent of the people who have an indwelling catheter develop bacteria, chronic bacteria and infection in their bladder." As a result, Foradori can expect to "have

problems with recurrent urinary tract infections." Indwelling catheters also cause "increased risk of bladder stones, kidney stones, . . . vesico-ureal reflux where [urine] goes back toward the kidney, hydronephritis or water on the kidney, bladder cancer, kidney cancer, renal [failure] and death."

Defecation for Foradori is even more uncomfortable. Foradori suffers from "neurogenic bowel," which means he has no control over his bowel and must endure partial bowel obstruction. Before Foradori moved to a nursing home, his father had to "perform digital stimulation [of the bowels] two times a week." This consisted of his father "perform[ing] digital stimulation, leav[ing] him in bed, wait[ing] until he's through being incontinent, and then clean[ing] him up, just chang[ing] the sheets and everything." Foradori's experience at the nursing home shows little improvement; "three nights a week I have to have something inserted into my bottom in order to make me go to the bathroom . . . I have to wait three or four hours in order to go to the bathroom and wait for somebody to come clean me up and turn me over." From this bowel stimulation, Foradori runs a high risk of developing both internal and external hemorrhoids and fissures in his rectum, and he runs increased risk of colon polyps and gall bladder disease. At the time of trial, Foradori experienced "a lot of incontinence of stool at school." Understandably, this sensitive area is of particular concern to Foradori, who, when first presented to Dr. Katz, "was very unhappy with the fact that he couldn't control his bowel or bladder."

Foradori also suffers from "neurogenic sexual dysfunction," so he has no function in his sexual organs. In his own words: "I can't feel. I can't control anything. I can't get an erection on my own." Foradori has been unable to achieve or maintain an erection even with the use of Viagra.

Before moving into a nursing home, Foradori depended on his family for his care routine. This required Foradori's father, who worked two jobs, to administer Foradori's bowel routine, shower him, dress him, and feed him daily. The wear of this responsibility on Foradori's father led Foradori to move to a nursing home, where he follows a limited routine every day:

> I get a bath on Tuesday and Thursdays; otherwise I wake up in the morning, take my medicine, they come in there around nine, 9:30, wash me up, put my clothes on for me. They have a lift, they use a pad that goes under my shoulders and under my legs to get me to a lift and they have to crank the lift up until it gets me up high enough to get me over my chair. And then they have to carry me over to my chair, put the lift around my tires, and push me back in my chair to let me down to make sure I'm all the way in, and strap me in. After I'm in the chair I basically just ride around all day, come back to my room, eat lunch, watch TV, ride around some more until it's suppertime; eat supper.

Since his injury, Foradori has suffered from "continuing pain most of the time," and much of this, such as pain in his head and shoulders as well as perceived pain in his feet, is "lifetime pain." For the six months following his injury, Foradori's neck hurt constantly and severely enough to remain "very bad" despite steady morphine doses. To date this neck pain continues periodically and Foradori suffers from muscle spasms that are sometimes "so bad it hurts my back, my shoulders, [and] my neck." Further, Foradori continues to have persistent pain in his shoulders caused by "bilateral subluxation of shoulders with early arthritis of both shoulders." This apparently arose because his accident created a one-inch gap between Foradori's shoulder bones and shoulders. Foradori also suffers from "disreflective headaches," triggered by

medical conditions in parts of his body where he lacks sensation. He describes these headaches as "like somebody's driving spikes into my skull to let me know something's wrong." Dr. Katz's observation of these headaches reflect that they occur "three to five times per week [and] last about an hour each . . . ." During these headaches, Foradori feels nausea, light-headedness, and light sensitivity in his eyes. Additionally, Foradori's present condition places him at such an extremely high risk for osteoperosis that "if he lives, he is going to have osteoperosis." In many patients, this condition has caused long bone fractures that could lead Foradori to accidently break his thigh during something as simple as being transferred from his bed to his chair. Most cruelly, Foradori, despite not having actual feeling in his feet, senses a burning pain in his feet as a result of brain activity termed "God's little joke" by Dr. Katz. Despite medication, this pain is and will be constant. Finally, Foradori's fall caused him to break a tooth, which causes him mouth and jaw pain.

Foradori's quadriplegia has also led to other medical conditions. For example he suffers from pressure sores, also known as bed sores, so severe that he has required numerous surgeries to repair the skin above his tail bone, on his hip, and on his left leg.

Foradori's emotional reaction to the accident has been as severe and lasting as his physical pain. Immediately after the accident, Foradori:

> felt like somebody had just flushed my life down the drain. I didn't – I didn't know what was going to happen. I didn't know what to expect. I wanted to die, because I didn't know how I was going to deal with it . . . . It hurt because . . . I knew that I wasn't going to walk again. I knew that I wasn't ever going to be able to do the things that I did, and it hurt. I couldn't deal with it.

This emotional pain persists:

> I try not to think about it, but there's a lot of things I can't do that bothers me. I can't ride four wheelers, I'll never play football or play basketball again. I'll never have sex again. Just never be able to go hunting, never be able to go fishing. And, you know, I see other people walking around . . . watch people do the stuff that I know I'll never be able to do, and it bothers me because I'll never be able to do it again.

Of course, Foradori's condition continues to impact his everyday life and affects his enjoyment of company:

> I can't stand to eat in front of people because it bothers me. I feel like people are watching me. I feel like people are, you know – I get the feeling that people are not laughing at me, but people – I feel like people automatically think I'm handicapped or I'm slow or I'm different than anybody else just because I can't walk, because I can't do the same thing that they do, and it hurts. . . .
> I deal with it, but I can't adjust myself to it. I always feel like somebody's looking at me; somebody's staring at me; somebody's judging me just because I'm like this, and not the same way they are.

Finally, Dr. Katz's testimony established that since Foradori's accident likely shortened his life span by a decade, Foradori could expect to live to the age of 68, and this estimate of the likely duration of his pain, suffering, mental and emotional anguish, and loss of quality and enjoyment of life was undisputed. Dr. Katz testified that, in light of his injury and if provided proper care, Foradori is projected to live until 2053. So, since Foradori suffered his accident in 2000, he

39

will be subject to the conditions discussed above for 53 years out of his 68-year total life expectancy.

c.

The district court's order giving its reasons for denying Captain D's motion for new trial or remittitur begins by correctly stating the issue under the Mississippi new trial/remittitur standard: "Was the jury's verdict against the overwhelming weight of the evidence?" In connection with its excessiveness challenge, Captain D's did not argue that the jury had been influenced by bias, prejudice or passion; thus, the only question was whether the awards were excessive because they "were contrary to the overwhelming weight of credible evidence." See Miss. Code Ann. § 11-1-55.

The district court explained that it had required the jury to specify the exact amount awarded for each major element of damages to enable it to closely scrutinize whether the awards corresponded to the evidence at trial. The court concluded that the jury's awards were, in fact, not contrary to but consistent with the evidence supporting each item, including those challenged for excessiveness.

The district court found that the jury award of $10 million for past, present, and future pain, suffering, including loss of enjoyment of life, which was a fraction of the $45 million requested by plaintiff's counsel in his closing argument, was not against the weight of the evidence. The court stated:

> It seems clear that Foradori has had to endure an extraordinary amount of suffering in his young life, even by the standards of quadriplegics. Once an active and athletic individual, Foradori now has only minimal and spastic use of his upper

40

extremities. He is unable to perform basic tasks of self-care, and he relies upon assistance to get out of bed, urinate, and defecate.

Cruelly, Foradori also suffers physical pain in addition to his disability, for which he must take Neurontin, a powerful analgesic. Foradori does not enjoy the level of family support enjoyed by many quadriplegics. Foradori's father works two jobs, and while he initially made efforts to perform those jobs and still care for his son, the physical and mental demands of such became too great. As a result, Foradori was forced to move to a nursing home, which is clearly a great emotional burden for a young man. While the jury's award in this case would eventually permit Foradori to buy a handicapped-accessible home and obtain some measure of independence and dignity, he does not presently enjoy such comforts. In light of the foregoing, the court does not view the jury's award of $ 10 million for past, present and future pain and suffering, including loss of enjoyment of life, to be excessive.

d.

With the foregoing legal principles in mind, we have carefully studied and reviewed the record, the written and oral arguments of counsel, and the reasons assigned by the district court. We are unable to say that the district court, who saw and heard the witnesses and who also studied and ruled on numerous motions and objections dealing with the evidence, abused its discretion in deciding to deny Captain D's new trial/remittitur motion because the jury's awards were not contrary to the overwhelming weight of credible evidence. In performing the limited function of a federal appellate court, we perceive no instance in which the district court failed to perform faithfully its role to determine whether the jury's verdict is within the confines set by state law. In this case the district court properly instructed the jury on Mississippi law and applied the proper state-law standard in considering whether the verdict returned was excessive. Giving "the benefit of every doubt to the judgment of the

trial judge" as we must, see Gasperini, 518 U.S. at 438-39 (quoting Dagnello, 289 F.2d at 806), we cannot find any abuse of discretion in the district court's reasoning or decision. For his past, present and future pain, suffering, mental and emotional anguish, and loss of enjoyment and quality of life, the jury awarded Foradori, who was 15 years old when he was injured and still has a quadriplegia-reduced life expectancy of 68 years, $10 million. We cannot say that the district court abused its discretion in deciding that this award was not contrary to the overwhelming weight of credible evidence that was introduced.

e.

Captain D's contends that the jury's verdict of $10 million for Foradori's past, present, and future physical pain and suffering, mental anguish, and loss of enjoyment of life was excessive and that a remittitur should be ordered. A remittitur is "an order awarding a new trial, or a damages amount lower than that awarded by the jury, and requiring the plaintiff to choose between those alternatives."[19] Thus, before a court may order a remittitur, it must first determine that a new trial is warranted. Except in those cases in which it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, the court may not reduce the amount of damages without giving the plaintiff the choice of a new trial, for to do so would deprive the parties of their constitutional right to a jury.[20] Our cases set forth several

---

[19] Black's Law Dictionary (8th ed. 2004); see also Hernandez v. M/V Rajaan, 841 F.2d 582, 587 (5th Cir. 1988) ("Having determined that an award is excessive, this court may either order a new trial on damages or may give the plaintiff the option of avoiding a new trial by agreeing to a remittitur of the excessive portion of the award").

[20] See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2815 & nn. 2-3 (2008) (citing Kennon v. Gilmer, 131 U.S. 22 (1889)); DeCenteno v. Gulf Fleet Crews, Inc., 798 F.2d

articulations of the standard that must be met before we will grant a new trial and consider coupling it with the alternative of a remittitur order, and Captain D's has failed to satisfy any of them.

Abuse of Discretion Standard. "The decision to grant or deny a motion for a new trial is generally within the sound discretion of the trial court, and reversible only for an abuse of that discretion." Shows v. Jamison Bedding, Inc., 671 F.2d 927, 930 (5th Cir. 1982). "When the trial judge has refused to disturb a jury verdict, all the factors that govern our review of his decision favor affirmance. Deference to the trial judge, who has had an opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record, operates in harmony with deference to the jury's determination of the weight of the evidence and the constitutional allocation to the jury of questions of fact." Id. (citing Massey v. Gulf Oil Corp., 508 F.2d 92,

---

138, 142 (5th Cir. 1986); Matador Drilling Co. v. Post, 662 F.2d 1190, 1198 (5th Cir. 1981); see also Hetzel v. Prince William County, 523 U.S. 208, 211 (1998) (finding that a "Court of Appeals' writ of mandamus, requiring the District Court to enter judgment for a lesser amount than that determined by the jury without allowing petitioner the option of a new trial, cannot be squared with the Seventh Amendment.") (citing Kennon, 131 U.S. at 29-30); Sloane v. Equifax Info. Servs., 510 F.3d 495, 503 (4th Cir. 2007) (holding that the Seventh Amendment "precludes an appellate court from replacing an award of compensatory damages with one of the court's own choosing"); Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 26 (1st Cir. 2006) (reversing a district court's reduction of compensatory damages without offering the plaintiff a choice of a new trial as legal error); Sloan v. State Farm Mut. Auto. Ins. Co., 360 F.3d 1220, 1225 (10th Cir. 2004) ("The Seventh Amendment requires that a plaintiff be given the option of a new trial in lieu of remitting a portion of the jury's award"); Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1329 (11th Cir. 1999) ("The Seventh Amendment requires, however, that the plaintiff be given the option of a new trial in lieu of remitting a portion of the jury's award."); Denesha v. Farmers Ins. Exchange, 161 F.3d 491, 504 (8th Cir. 1998) ("the practice of granting remittitur without giving the plaintiff the option of a new trial 'cannot be squared with the Seventh Amendment.'"); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 914-15 (2d Cir. 1997) ("Where a jury has awarded damages in an amount considered excessive by the trial court, '[i]t is not among the powers of the ... court ... simply to reduce the damages without offering the prevailing party the option of a new trial.' This rule derives from the trial-by-jury protections of the Seventh Amendment.")(internal citation omitted).

94-95 (5th Cir. 1975)); see also Salinas v. O'Neill, 286 F.3d 827, 830 (5th Cir. 2002); Eiland v. Westinghouse Elec. Corp., 58 F.3d 176, 183 (5th Cir. 1995) ("The decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse"); Brunnemann v. Terra Int'l, Inc., 975 F.2d 175, 178 (5th Cir. 1992) (concluding that the district court abused its discretion in denying defendant's motion for remittitur); Hernandez v. M/V Rajaan, 841 F.2d 582, 587 (5th Cir. 1988) ("This court will not overturn a damage award unless the trier of fact abused its discretion") .

Strongest of Showings Standard. This court has firmly established in previous cases that it will not reverse a jury verdict for excessiveness except on "the strongest of showings." Lebron v. United States, 279 F.3d 321, 325 (5th Cir. 2002); Enter. Ref. Co. v. Sector Ref. Co., 781 F.2d 1116, 1118 (5th Cir. 1986); Dixon v. Int'l Harvester Co., 754 F.2d 573, 590 (5th Cir.1985); Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir. 1983); Shows, 671 F.2d at 934; Bridges v. Groendyke Transp., Inc., 553 F.2d 877, 880 (5th Cir. 1977). The size of the award a plaintiff is entitled to is generally a question of fact, and the reviewing court should be "exceedingly hesitant" to overturn the decision of the jury –the primary fact finder– and the trial judge who concurred with its verdict. Shows, 671 F.2d at 934 (citing Bridges, 553 F.2d at 880). Thus, we have upheld the denial of a new trial on the question of damages even when we have disagreed with the award, see id. (citing Bridges, 553 F.2d at 881 & n.2), and we will reverse an award as excessive only when it "clearly exceeds that amount that any reasonable man could feel the claimant is entitled to." Id. (citing Bridges, 553 F.2d at 880; Bailey v. S. Pac. Transp. Co., 613 F.2d 1385, 1390 (5th

Cir. 1980)) (emphasis original); see also Ramirez v. Allright Parking El Paso, Inc., 970 F.2d 1372, 1378 (5th Cir. 1992); Enter. Ref. Co., 781 F.2d at 1118.

Shock the Judicial Conscience Standard, et al.  The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. Caldarera, 705 F.2d at 784; see also Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc., 293 F.3d 912, 924 (5th Cir. 2002) (citing Caldarera, 705 F.2d at 784).  "We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to 'shock the judicial conscience,' 'so gross or inordinately large as to be contrary to right reason,' so exaggerated as to indicate 'bias, passion, prejudice, corruption, or other improper motive,' or as 'clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to.'" Caldarera, 705 F.2d at 784 (quoting Complete Auto Transit, Inc. v. Floyd, 249 F.2d 396, 399 (5th Cir. 1958); Allen v. Seacoast Prods., Inc., 623 F.2d 355, 364 (5th Cir. 1980); Bridges, 553 F.2d at 880); see also Williams v. Chevron U.S.A., Inc., 875 F.2d 501, 506  (5th Cir. 1989) (quoting Caldarera 705 F.2d at 784).

Captain D's does not even attempt to satisfy any of the foregoing standards for our ordering a new trial with a remittitur in the alternative. Instead, Captain D's argues that it is entitled to an appellate court reduction of the jury's verdict under our maximum recovery rule simply because the jury's verdict exceeds the recovery allowed in two allegedly similar cases from jurisdictions other than Mississippi, viz., two  decisions  based respectively  on Louisiana law and American maritime law: Duncan v. Kansas City S. Ry. Co., 773 So. 2d 670 (La. 2000) and Sosa v. M/V Lago Izabal, 736 F.2d 1028 (5th Cir. 1984).  Captain D's cannot invoke the maximum recovery rule in this case,

however, because it concedes that "there are no reported cases from Mississippi addressing the recovery for pain and suffering for injuries like those sustained by Foradori[.]" As one of our panels observed in Vogler v. Blackmore, 352 F.3d 150, 158 (5th Cir. 2003), when "[o]ur review of the caselaw reveals that there is no factually similar case in the relevant jurisdiction[,] the maximum recovery rule is not implicated."[21] Thus, because Captain D's has not satisfied any of the standards for the granting of a new trial or shown that it is in position to invoke the maximum recovery rule, it would be a gross aberration in law and justice to set aside Foradori's jury verdict based on a comparison with two reported decisions of foreign jurisdictions.[22]

---

[21] The author, writing for himself and not the other panel members, notes that the maximum recovery rule applies when an appellate or trial court properly orders a new trial with a remittitur. In such a case, the rule requires that the alternative reduced award be set no lower than the maximum recovery possible on the evidence and controlling law of the case. See, e.g., Hernandez v. M/V Rajaan, 841 F.2d 582, 587 (5th Cir. 1988); Zeno v. Great Atlantic and Pacific Tea Co., 803 F.2d 178, 181 (5th Cir. 1986); Caldarera 705 F.2d at 784 & n.21. The purpose of this rule is to maintain the constitutional allocation of fact-finding to the jury by affording the plaintiff the choice of avoiding a new trial by accepting the lesser amount that the court deems the maximum that the jury reasonably could have awarded on the evidence and law applicable to the case. See, e.g., Gorsalitz v. Olin Mathieson Chemical Corp, 429 F.2d 1033, 1046-47 (5th Cir. 1970) ("This theory permits reduction only to the highest amount which the jury could properly have awarded. It is the only theory which has any reasonable claim of being consistent with the Seventh Amendment."); see also Salinas, 286 F.3d at 830; Caldarera 705 F.2d at 784; Shows, 671 F.2d at 930; 11 C. Wright & A. Miller, Federal Practice and Procedure § 2815 (2008).

The case upon which Captain D's principally relies, Lebron v. United States, 279 F.3d at 321, clearly does not hold otherwise. In that case, though reviewing a bench trial rather than a jury verdict, this court carefully recognized that the "strongest of showings" standard had to be satisfied before a new trial or alternative remittitur could be ordered, see id. at 325, and in arriving at the maximum alternative remittitur award under the maximum recovery rule, this court stated that it was required to base its calculations on the jurisprudence and law of the forum state, not upon that of a foreign jurisdiction. See id. at 326.

[22] Aside from the legal flaws in Captain D's argument, its sample of allegedly comparable awards is too narrowly selective to serve any practical or objective purpose. After stating that it was unable to find any comparable Mississippi case, Captain D's gives no reason

For these reasons, we conclude that Captain D's has not satisfied the strict standards that must be met before we will reverse the jury verdict on the ground that it was excessive.[23]

---

for failing to include in its sample many other cases of somewhat similar catastrophic injuries outside that jurisdiction. See, e.g., Pouliot v. Paul Arpin Van Lines, Inc., 235 F.R.D. 537, 550-51 (D. Conn. 2006) (applying Connecticut law in diversity and finding that a $20 million verdict for non-economic damages was not excessive when a man was rendered paraplegic); Hess v. Ford Motor Co., 41 P.3d 46, 51 (Cal. 2002) (noting without reviewing the underlying $8.4 million award for non-economic damages when plaintiff was rendered paraplegic in a car accident); Pelletier v. Sordoni/Skanska Constr. Co., 2006 WL 760140 at *1, *3 (Conn. Super. Ct. 2006) (denying remittitur when jury awarded $22 million in non-economic damages to a plaintiff rendered paraplegic); see also Velarde v. Illinois Cent. R.R. Co., 820 N.E.2d 37, 54, 61 (Ill. App. Ct. 2004) (affirming a $15.5 million non-economic damages award for a father and a $28 million non-economic damages award for a daughter, both of whom were struck by a train and suffered disabling head injuries); Epping v. Commonwealth Edison Co., 734 N.E.2d 916 (Ill. App. Ct. 2000) (finding an award of $9 million in non-economic damages was not excessive for 49-year-old automobile accident victim who suffered severe, debilitating injuries to her right leg and left hip, along with deformity of foot and other injuries); Schifelbine v. Foster Wheeler Corp., 772 N.Y.S.2d 140 (N.Y. App. Div. 2004) (finding that $21 million award to quadriplegic for total damages was not excessive).

[23] The author, writing for himself and not the other members of this panel, notes that Captain D's argument here is also unacceptable in light of the Supreme Court's decision in Gasperini v. Center for Humanities, 518 U.S. 415, 432 (1996), in which it concluded that "'the influence - if not the command - of the Seventh Amendment,'" 518 U.S. at 432 (quoting Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 537 (1958)(footnote omitted)), requires federal courts of appeals to review a federal trial court's denial of a motion to set aside a jury's verdict as excessive only for an "abuse of discretion." Id. at 439. In other words, in order to avoid detriment to the Seventh Amendment's reexamination clause, our review of the district court's denial of a new trial may not be less deferential than for "abuse of discretion." Id. at 419. Appellate review for abuse of discretion is reconcilable with the Seventh Amendment because it involves "not a question of fact with respect to which reasonable men may differ, but a question of law." Id. at 435 (quoting Dagnello, 289 F.2d at 806). Accordingly, "[i]f we reverse, it must be because of an abuse of discretion . . . . The very nature of the problem counsels restraint . . . . We must give the benefit of every doubt to the judgment of the trial judge." Id. at 438-439 (citing Dagnello, 289 F.2d at 806).Consequently, we may not, as Captain D's importunes, undertake a re-examination of the facts of this case in comparison with the facts of other awards in other jurisdictions' cases to determine whether the jury verdict's damages award here is excessive. Under Gasperini, we can only review the district court's denial of a new trial or remittitur for an abuse of discretion. Having performed that review carefully and thoroughly in accordance with the Supreme Court's decision, and finding no abuse of discretion

## C. Trial Errors

Captain D's contends that a new trial is warranted because various trial errors rendered the proceedings fundamentally unfair to it. Captain D's points to the following: (1) allowing plaintiff's expert witness, Stuart Feigenbaum, to testify to matters outside his expertise; (2) admitting irrelevant prejudicial evidence regarding Captain D's training manuals and post-accident conduct; (3) excluding evidence of Foradori's marijuana use; (4) excluding evidence of Foradori's family circumstances; (5) allowing Foradori's counsel to make a per-diem argument for damages; (6) giving improper jury instructions on respondeat superior and duty and submitting to the jury a confusing form verdict; (7) upholding the jury's compromise verdict for future medical expenses; and (8) admitting plaintiff's unauthenticated medical bills as an exhibit.

A new trial will not be granted based on trial error unless, after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand. See Johnson v. Ford Motor Co., 988 F.2d 573, 582 (5th Cir. 1993). "We will reverse the trial court's denial of a motion for new trial only when there is a clear showing of an abuse of discretion." Carr v. Wal-Mart Stores, Inc., 312 F.3d 667, 670 (5th Cir. 2002) (quoting Hiltgen, 47 F.3d at 703).

### 1. Testimony of Stuart Feigenbaum

When Foradori tendered Stuart Feigenbaum as an expert in the field of restaurant management, Captain D's stated: "No objection." On direct examination, Feigenbaum opined that Captain D's had negligently trained and

---

by the district court, we cannot set the district court's decision or the jury's verdict aside.

supervised its employees. Captain D's still offered no objection. On cross-examination, Feigenbaum answered defense counsel's questions about how restaurants should guard against workplace violence, particularly as to what precautions and actions restaurant manager Peggy King should have taken because of the altercation. Fiegenbaum conceded, however, that he was not an expert in "specific training" on "how to diffuse workplace violence."[24] Even so, he answered defendant's attorney's questions according to his "common sense." During redirect examination, the district court consistently sustained objections by Captain D's counsel to ill-founded questions by counsel opposite.[25] After the close of testimony, the district court instructed the jury to consider whether the expert testimony was based on sufficient education and experience.

Despite offering no relevant, timely objection to Feigenbaum's qualification and expertise at trial,[26] Captain D's now asserts that Feigenbaum was

---

[24] Fiegenbaum's testimony is susceptible to the reasonable interpretation that, while he was knowledgeable in restaurant management and the basics required of managers in handling potentially violent situations, he was not an expert in teaching specifics to individual manager-trainees.

[25] When Foradori's counsel asked Feigenbaum "if we don't understand all of their training [i.e. Captain D's training policies as evidenced in Captain D's manuals] as was suggested [by defense counsel], whose fault is that[?]," the district court sustained Captain D's objection, stating that such opinion was outside of Feigenbaum's area of expertise. Also, the district court sustained objections to plaintiff counsel's mischaracterization of King's testimony and to leading questions.

[26] In a motion in limine, Captain D's raised a Daubert objection to Feigenbaum's qualifications; however, Captain D's waived it by failing to timely object to his qualification and testimony at trial. See C.P. Interests, Inc. v. Cal. Pools, Inc., 238 F.3d 690, 701 (5th Cir. 2001) (holding that although a defendant filed a motion in limine on an evidentiary issue, a failure to object to the evidence at trial waives the issue for appeal); Wilson v. Waggener, 837 F.2d 220, 222 (5th Cir. 1988) ("In order to preserve the admission of evidence as error for appellate review, an objection must be made at trial. A motion in limine is insufficient to meet this requirement. A party whose motion in limine is overruled must renew his objection when the evidence is about to be introduced at trial. [By failing to object to an evidentiary issue at

"improperly permitted to give testimony unsupported by the expertise required by Rule 702 of the Federal Rules of Evidence." Specifically, Captain D's argues that, although it did not object to Feigenbaum's acceptance as an expert on restaurant management, because he later conceded that he had no expertise in specific training of employees to defuse workplace violence, his un-objected-to testimony on the inadequacy of Captain D's training and regulation of its managers, particularly Peggy King, should not have been presented to the jury. Captain D's asserts that Feigenbaum's testimony in this area prejudiced the jury because his testimony was the only support for the jury's finding of negligent training, regulation, supervision, and control of employees.

Because Captain D's did not timely object to the testimony it now challenges, we review these claims for plain error only, see United States v. Duffaut, 314 F.3d 203, 208-09 (5th Cir. 2002), and conclude that Captain D's cannot meet this standard. Though Captain D's arguments fail to satisfy many of the requirements for plain error, we note only the crucial shortcoming that is simplest to address: Captain D's failed to demonstrate that any alleged error affected its substantial rights. Captain D's contends that it was prejudiced by Feigenbaum's testimony because it was the only evidence supporting the jury's finding that defendant's negligent supervision and training of its employees was a proximate cause of Foradori's injury. But, as we have already described above, the jury's verdict was overwhelmingly supported by other evidence, viz., the

---

trial, plaintiff] has not preserved this issue for appellate review.") (internal citation omitted).

Captain D's contends that its motion to strike Feigenbaum's testimony should suffice for a timely objection, but this motion was not raised until the day after Feigenbaum had finished testifying. As such, it cannot be considered timely. See United States v. Pettigrew, 77 F.3d 1500, 1516 n.14 (5th Cir. 1996) (holding that a motion to strike testimony filed the following day does not constitute a "timely objection" under Fed. R. Evidence 103(a)).

50

testimony elicited from Captain D's employees and managers as well as Foradori. Thus, the jury's verdict was amply supported even without Feigenbaum's testimony. Because Captain D's does not contend that it was prejudiced in any other way by Feigenbaum's testimony, we conclude that it has made no showing that any error in this respect affected its substantial rights. Consequently, Captain D's cannot demonstrate plain error. See id.

2. Argument regarding Captain D's training manuals and post-accident conduct

Captain D's argues that the district court erred by admitting into evidence Captain D's training manual, which contains an instruction that employees should "never admit fault," and testimony regarding Captain D's post-accident conduct. Captain D's contends that this evidence is sufficiently irrelevant under Fed. R. Evid. 401 and prejudicial under Fed. R. Evid. 403 that it should have been excluded. Further, Captain D's asserts that the district court's permitting Foradori's counsel to rely on this evidence in arguments to the jury sufficiently prejudiced Captain D's so as to warrant a new trial. We disagree.

Captain D's did not object to admission of the training manual's "never admit fault" provision at trial.[27] Accordingly, we review this issue for plain error only, see Duffaut, 314 F.3d at 208-09, and we find none because any possible error here is not clear or obvious. See id. While the manual's instruction that

---

[27] In a motion in limine, Captain D's did object to the "never admit fault" materials, seeking to have that portion of the training manual redacted. The district court denied the motion just prior to the commencement of trial. However, Captain D's waived the issue for appeal because it failed to renew the motion with a timely objection when the evidence was introduced at trial. See Fed. R. Evid. 103(a); C.P. Interests, Inc., 238 F.3d at 701; Wilson, 837 F.2d at 222.

employees should "never admit fault" is probably prejudicial and was repeated as a refrain in Foradori's attorney's closing arguments, the district court admitted the training manual's statement for the relevant purpose of showing Captain D's failure to train and inculcate its employees in their responsibility for protecting customers from risks attendant to on-premises conflicts. The district court could, within its discretion, have determined that the danger of unfair prejudice here was minimal and did not outweigh the probative value of the evidence. Thus, there is no reversible plain error here because there is no clear error.

As for evidence of Captain D's post-accident conduct, this testimony was not unfairly prejudicial and its admission did not constitute an abuse of discretion. Captain D's objected to questions about whether Rhodes, Captain D's general manager, asked his employees about the incidents leading up to Foradori's injury. Rhodes stated that he did not. He also stated that the two employees involved in the fight, Harris and Cannon, were not fired immediately after the incident because he considered the episode to have been an accident. Finally, he stated that his managers were the ones who conducted the investigation and that they "told me everything I needed to know." The district court found this testimony to "shed[] considerable light upon [the] managerial style." The trial judge reasonably could have concluded that the evidence of Captain D's lack of concern and precautions for customer safety post-episode had probative value tending to show managerial attitudes at the time of the altercation and assault that was not substantially outweighed by its prejudicial effects. Thus, the district court did not abuse its discretion by admitting this evidence.

3. Marijuana usage

Captain D's argues that the district court erred in excluding the testimony of its expert witness, Dr. Fredrick Carlton, who would have expressed his opinion that Foradori's marijuana use could have made him more susceptible to spinal injury and memory impairment. Dr. Carlton was not Foradori's treating physician, had never examined Foradori, and had no first hand knowledge of Foradori's alleged admission to marijuana use. Dr. Carlton evidently was willing to testify, based exclusively on another doctor's report of Foradori's statement,"[I] smoked some weed," in the emergency room, that his ingestion of an unknown quantity of marijuana could have contributed to Foradori's broken neck.

The district court found that the danger of unfair prejudice by the evidence substantially outweighed its probative value under Fed. R. Evid. 403. The court stated that "Dr. Carlton would have this court believe that only an intoxicated individual who is struck from behind in an extremely violent manner which causes him to immediately lose consciousness and fall off a retaining wall could suffer a cervical spine injury." The district court concluded that this testimony was highly unlikely to be reliable, did not satisfy Daubert scrutiny, and would only risk misleading the jury under the guise of expert testimony.[28] The district court did not abuse its discretion.

---

[28] The district court also noted the possible prejudicial effect of the marijuana evidence, suspecting that Captain D's attorneys impermissibly intended to use the evidence primarily to cast doubts on Foradori's character. This suspicion arose in conjunction with another "low point at trial," in which Captain D's attorney, without any prior or subsequent justification asked Foradori, who is obviously a caucasian, whether his girlfriend is an African-American.

53

## 4. Evidence of Foradori's family situation

Captain D's also alleges that the district court erred in preventing it from challenging Foradori's future earning potential, particularly the assumption that he would graduate from college, by excessively restricting the cross-examination of Foradori and Foradori's father. We conclude that the district court did not abuse its discretion and that Captain D's was not unduly limited in its ability to cross-examine.

The only limitation that the district court placed on Captain D's cross-examination was that any evidence meant to challenge Foradori's future earning potential must be probative of that issue, and this requirement that evidence be relevant to the issue it purports to establish cannot be an abuse of discretion. In a pre-trial order, the district court expressly stated that it would allow evidence relevant to Foradori's future earning potential but would require that any evidence offered for this purpose have actual probative value.[29] During trial, the district court twice reminded Captain D's of this order but specifically allowed Captain D's to question Foradori about his father's educational background and to question Foradori's father about Foradori's desire to attend college.

Nonetheless, Captain D's claims that the district court erred by "exclud[ing] any testimony to directly rebut testimony about Foradori's future income." Specifically, Captain D's complains that the district court erred in excluding 1) evidence that Foradori used marijuana, 2) Foradori's father's

---

[29] "The court will permit Captain D's to introduce evidence which might tend to establish Foradori's future earning potential (or lack thereof), but the court will take care that any such evidence has actual probative value in this regard and that it is not merely used to 'smear' or denigrate [Foradori and his family] in the eyes of the jury."

testimony that he believed Foradori had used alcohol and illegal drugs, and 3) Foradori's father's testimony that Foradori was "heading for trouble" and "not towards the direction of college." We disagree.

As for Foradori's father's testimony that he believed Foradori had used drugs and alcohol and that Foradori was not heading towards college, the district court did not exclude this evidence. Rather Captain D's chose not to pursue it, voluntarily limiting its questioning of Foradori's father before the jury and asking these questions only as an offer of proof. Also, contrary to Captain D's assertion, during cross-examination before the jury Captain D's did question Foradori's father about Foradori's desire to attend college, and the district court made no limitation on this cross-examination.

Further, we find that the district court did not err in excluding evidence of Foradori's marijuana use. As the district court noted, evidence that Foradori merely used marijuana on unspecified occasions in the past is highly prejudicial, and it has little bearing on Foradori's likelihood to attend college or his future earnings. Thus, the district court did not abuse its discretion in excluding the highly prejudicial and minimally relevant evidence of Foradori's marijuana use.

### 5. Per-diem closing argument

Captain D's contends that under our precedents we must grant it a new trial because the district court (after allowing plaintiff's counsel, over defendant's objection, to make an argument suggesting a per diem or unit-of-time dollar amount which the jury should award for loss of enjoyment of life) did not, sua sponte, instruct the jury that the argument was simply counsel's method of presenting his contention and was not evidence in the case – even though the defense did not request such an instruction. In effect, Captain D's

contends that a district court's allowance of any objected-to unit-of-time argument is per se reversible error unless the court automatically cures it with a cautionary instruction.

Our cases do not establish such a hard and fast rule, however. We have held that a unit-of-time argument is not reversible per se[30] but may be allowed, within the trial court's discretion, when couched with proper safeguards or otherwise cured.[31] In so holding, we warned of dangers that may accompany a unit-of-time argument and suggested safeguards that district courts may use to control them.[32] We indicated that when an objected-to unit-of-time argument is made the district court may not within its discretion deny the defendant at least the right to the chief safeguard, a cautionary instruction.[33] But we have never

---

[30] Westbrook v. Gen. Tire & Rubber Co., 754 F.2d 1233, 1240, n.5 (5th Cir 1985).

[31] Id. (citing Country Mut. Ins. Co. v. Eastman, 356 F.2d 880 (5th Cir. 1966); Baron Tube Co. v. Transp. Ins. Co., 365 F.2d 858 (5th Cir. 1966) (en banc) (modifying Johnson v. Colglazier, 348 F.2d 420 (5th Cir. 1965)).

[32] Baron Tube, 365 F.2d at 865. ("The safeguards which may be utilized may take the form of requiring that counsel notify the court and opposing counsel in advance of argument that the unit of time argument will be made. Since charts are generally used, they should be carefully scrutinized to eliminate any false factual impressions. Also, the court should, as was done in the instant case, make it clear to the jury that the unit of time argument is merely a method of presenting contentions, and is not to be considered as evidence. This may be done at the time the argument is made, or in charge to the jury, or on both occasions. And, as Judge Brown went on to say in his dissent: '* * * to assure effective complete policing, the Court can construct the charge, either general or on special interrogatories, so that each element is separately fixed. (Rule 49, F.R.Civ.P.) The Judge can readily tell whether the verdict is measurably infected on this element by an extravagant runaway jury.' Lastly, it goes without saying that the court has ample control over excessive verdicts.")

[33] Id. ("We hasten to reiterate that these matters, except for requiring a cautionary instruction, are left to the discretion of the trial court."); accord Fontenot v. Dual Drilling Co. 179 F.3d 969 (5th Cir. 1999) (reversing damage award based on failure to give tendered cautionary instruction regarding unit-of-time argument coupled with failure to submit requested jury interrogatory on comparative fault); Colburn v. Bunge Towing, Inc., 883 F.2d

held that a district court which allows an objected-to unit-of-time argument must sua sponte give an unrequested cautionary instruction in order to avoid reversible error.[34]

In our decisions involving challenged unit-of-time arguments, we have overturned a jury verdict on damages only when, after careful examination of the nature of the argument within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court,[35] there is a clear showing of excessiveness or that the verdict was influenced by passion or prejudice.[36] Other factors we have taken into account in making this determination are whether the jury appears to have adopted counsel's unit-of-time argument,[37] whether there was any other contributing impropriety or error,[38] whether the award borders on or surpasses the

---

[34] Cf. *United States v. Moreno*, 84 F.3d 1452 (D.C. Cir 1996) ("As to the failure of the district court to give a sua sponte cautionary instruction, we observed in *United States v. Rhodes* that "there are occasions when, for tactical reasons, defense counsel may wish to forego ... a limiting instruction because it might focus the jury's attention on the damaging evidence" and that "we cannot impose on district courts the obligation to give such an instruction sua sponte." 62 F.3d 1449, 1453-54 (D.C. Cir.1995), *petition for cert. filed* (U.S. Jan. 30, 1996) (No. 95-7711).")

[35] Westbrook, 754 F.2d at 1239.

[36] Id. at 1241 (citing Martin v. City of New Orleans, 678 F.2d 1321, 1326-27 (5th Cir. 1982); Shows, 671 F.2d at 934.

[37] Id. at 1240.

[38] Id. at 1238, 1241.

excessive,[39] and whether it appears that something besides the evidence was at work.[40]

In the present case, after examining the record in light of the foregoing factors, we conclude that there is no reasonable likelihood that the per-diem argument on loss of enjoyment of life which Captain D's complains of in this appeal caused or contributed to an unfair or excessive verdict.

In that argument, plaintiff's counsel stated:

> Michael Foradori Jr. got paralyzed by their employee on their property when he was 15 years old. If he lives to be 68 instead of 78 he's going to live 19,345 days. If he lived his normal life expectancy, he would live to be 78. That's 3650 days of a lifetime. Of losing enjoyment of that part of his life. Total days, 22,995 days.
> Now, as to the loss of enjoyment of life, let's drop down to the bottom right here. Less than $1100 a day for loss of enjoyment of life for the 22,995 days is $25 million. You know, it's a big number. But I put a big value on life and the enjoyment of life and arms and legs and the stuff that this boy's been required to go through.

Plaintiff's counsel did not present any charts or complicated calculations in support of this brief, simple oral statement. In the argument, the lawyer did nothing to disguise that he was asking the jury to accept his own suggestion of how much Foradori should be compensated per day for his loss of enjoyment of life and to multiply that amount by the number of days of Foradori's remaining expected lifetime, which had been estimated by the expert witnesses.

---

[39] Id. at 1240.

[40] Id.

By its nature, this transparent per-diem argument does not present the dangers that we have detected in more elaborate unit-of-time arguments supported by charts and formulae in previous cases. For example, in Johnson v. Colglazier, 348 F.2d at 425, this court described with disapproval the plaintiff's counsel's per-diem argument as follows:

> [A]n argument designed, calculated, and effective to mislead the jury into believing that the determination of a proper award for legal damages for pain and suffering is a matter of precise and accurate determination and not, as it really is, a matter to be left to the jury's determination, uninfluenced by arguments and charts of the kind involved here, which could only be regarded as tending to mislead the jury into believing that there was an accurate 'legal' guide or chart to assist and direct them in reaching a large verdict for pain and suffering on considerations which have no proper legal place in the determination.

Foradori's attorney, unlike the counsel in Johnson v. Colglazier, displayed no design to mislead the jury. He used no chart or legal guide and made no pretense that the amount of less than $1100 per day he suggested to the jury was based anything but his own thoughts. Further, he explained his contention with simple arithmetic rather than difficult to understand tables or formulae. Thus, in this case, the per-diem argument was plain and simple enough that, even without a cautionary instruction, it was "clear to the jury that the unit of time argument is merely a method of presenting contentions, and is not to be considered as evidence."[41]

---

[41] Baron Tube, 365 F.2d 858, 865 (5th Cir. 1966).

Further, the district court gave an extensive instruction making clear to the jury that the attorneys' arguments did not constitute evidence and that the sworn testimony of the witnesses and the exhibits were the only evidence that the jury could consider. The court, in pertinent part, charged the jury as follows:

> As stated earlier, it is your duty to determine the facts and in so doing you must consider only the evidence I have admitted in the case. The term evidence includes the sworn testimony of the witnesses and the exhibits admitted in the record.
>
> Remember, any statements, objections or arguments by the lawyers are not evidence in this case. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding on you.

Additionally, the district court made use of other safeguards recommended by this court in Baron Tube by requiring the jury to answer special interrogatories fixing separately the amount of each itemized award for pain and suffering and loss of enjoyment of life; past reasonable and necessary medical expenses incurred; present value of future such medical expenses; and present value of loss of future earnings and earning capacity. Thus, the district court's use of that safeguard enabled it to readily determine that the awards were based on the jury's own sound discretion and not measurably infected by the attorneys' arguments.

Further, there is no evidence or sign that the jury adopted the unit-of-time argument or was influenced by it in any way. Foradori's attorney used a unit-of-time argument to suggest that the jury award $20 million for pain and suffering

and $25 million for loss of enjoyment life, or a total of $45 million for both. The jury awarded Foradori only a total of $10 million for both. On appeal, Captain D's does not even complain or argue against plaintiff counsel's use of a similar per-diem argument in suggesting an award for Foradori's pain and suffering.

Finally, as explained earlier in this opinion, the damages that the jury awarded Foradori for his pain and suffering and loss of enjoyment of life do not border on or surpass the excessive. The decision to grant or deny a motion or a new trial rests in the sound discretion of the trial judge; that discretion can be set aside only upon a clear showing of abuse.[42] Where, as here, the trial judge has denied the motion and left the decision of the jury intact, this circuit has shown even greater deference to the trial judge's discretion.[43] Finding no abuse of discretion or trial error in connection with the per-diem argument, we decline to set aside the district court's ruling or judgment.

### 6. Jury instructions and verdict forms

Captain D's argues that the district court gave two erroneous instructions and an erroneous verdict form to the jury. However, Captain D's fails to designate, and we cannot find, any clear or distinct objection to these instructions and verdict form in the record.[44] Thus, we review these claims for

---

[42] Westbrook, 754 F.2d at 1241 (citing Franks v. Associated Air Ctr., Inc., 663 F.2d 583, 586 (5th Cir. 1981); Evers v. Equifax, Inc., 650 F.2d 793, 796 (5th Cir. 1981)).

[43] Id. (citing Franks, 663 F.2d at 586; Reeves v. Gen. Foods Corp., 682 F.2d 515, 519 (5th Cir. 1982)).

[44] Federal Rule of Civil Procedure 51(c), in pertinent part, provides: "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating

plain error only. See Russell v. Plano Bank & Trust, 130 F.3d 715, 721 (5th Cir. 1997) ("Where the party challenging the district court's instructions has failed to raise the objection before the district court and his position has not been made clear to the court in some other manner, our consideration of the issue is limited to plain error review.").

Captain D's contends that the district court: (1) gave a jury instruction on "respondeat superior" that "implicitly allowed the jury to impute to Captain D's the independent, criminal conduct of Harris"; (2) failed to instruct the jury that Captain D's only owed a duty to supervise or train if it knew of Harris's propensity for violence or of an atmosphere of violence; and (3) provided the jury with a confusing verdict form. We conclude that the district court did not commit clear error in any of these respects.

The district court's instructions did not implicitly inform the jury that it could hold Captain D's vicariously liable for Harris's intentional criminal conduct. The district court instructed the jury only on negligence theories and did not mention Harris's intentional criminal conduct except in respect to the defensive theory of superseding cause. The district court instructed that Captain D's could be held liable for its officers' or employees' negligent failure to train or supervise its employees if the jury determined that the negligence on the part of Captain D's was a proximate cause of injury suffered by Foradori. Then, after giving instructions on proximate cause, the court charged the jury that:

---

distinctly the matter objected to and the grounds of the objection."

> if you find from a preponderance of the evidence in this case that the defendant Captain D's LLC was negligent in training and/or supervising its employees, but that an independent and unforeseeable act by a third person, namely an assault on Michael Foradori by Garious Harris, followed defendant's negligent acts and was a substantial factor in causing the plaintiff's injuries, then the defendant is not liable for the injuries proximately resulting from the superseding cause and your verdict should be for the defendant.

The district court's instructions also admonished the jurors to consider the instructions as a whole and not to single out one instructions as stating the law. We see no plain error in these instructions.

Captain D's is simply mistaken in contending that the district court should have instructed the jury that Captain D's liability hinged upon its knowledge of Harris's propensity for violence or of an atmosphere of violence. As we explained earlier in this opinion, Foradori did not seek to hold Captain D's liable on the theory that it negligently hired or retained Harris because it knew or should have known of Harris's propensity for violence; nor did Foradori base his claim on the theory that there was a preexisting atmosphere of violence in the neighbor of the restaurant. Consequently, jury instructions on those theories would have been irrelevant and perhaps misleading and confusing to the jury. The district court did not plainly err in refusing to give them.

Also, the district court addressed and corrected any possible confusion in its verdict form. The form at issue was first written: "we, the jury, find that both the plaintiff and the defendant ___ were ___ were not negligent." The jury asked what to do if the verdict was for the plaintiff alone. The court conferred with the

parties, admitted that there was a problem, and issued a corrective instruction which both parties agreed to and allowed to be given without objection. There was no plain error in this respect.

### 7. Compromise Verdict

Captain D's argues that the jury award of $8 million to Foradori for the present value of the reasonable and necessary medical expenses he is likely to incur in the future was an improper compromise verdict.[45] The record does not support this contention.

At trial, Foradori's expert testified that Foradori's future medical expenses in "present value" dollars would add up to $10,329,567.18. Captain D's expert did not testify, but Captain D's was allowed to introduce his written report in which he estimated the present value of Foradori's future medical expenses to be $6,300,924.00. Both estimates appear to be open to criticism as either based partially on unproven assumptions or unadjusted calculations.[46]

---

[45] Captain D's allegations do not fit the mold of typical "compromise verdict" claims we have considered in the past. See, e.g., Pagan v. Shoney's, Inc., 931 F.2d 334, 339 (5th Cir. 1991) ("A compromise verdict occurs when a jury which is unable to agree on liability compromises that disagreement and awards inadequate damages."). Nonetheless, we review the claim as Captain D's presents it.

[46] On the one hand, the opinion of Nat Fentress, Foradori's expert in life-care planning for the catastrophically injured, could be criticized as omitting an adjustment for the present value of Foradori's expected future medical expenses because, though it stated an amount in "present value" dollars, it did not appear to account for actuarial economic principles such as the potential use of annuities to fund future medical expenses. Also, by Fentress's own admission, his calculation took no account of potential inflation in the cost of medical expenses, which could result in the need for substantial upward revision of the figure.

On the other hand, the report of Captain D's economic expert, Dr. Gerald Lee, may be

The district court submitted to the jury a special interrogatory for damages, asking, in relevant part, for the "present value of the reasonable and necessary medical expenses to be incurred by plaintiff in the future"; the jury awarded $8 million. Captain D's challenged this verdict in its motion requesting a new trial on damages or remittitur. The district court denied the motion, assigning extensive reasons for refusing to alter the jury's verdict. As part of its reasoning, the district court observed:

> This is not an element of damages about which there is some mathematically "correct" amount; any calculations in this regard inherently involve a large degree of guesswork regarding plaintiff's life expectancy and the amount of medical care which he will require. Captain D's asserts that the jury's verdict was a "compromise" but there is no evidence in support of that assertion, such as if the award had been the precise difference between the two calculations...[T]he court does not view an $8 million award as being against the overwhelming weight of the evidence for a young quadriplegic who will require constant care (including assistance urinating and defecating, pain and antidepressant medication, among many others) for the rest of his life.

---

faulted for relying on an incorrect premise. Dr. Lee's report offers an estimate of the present value, assuming a 50 year life span, of the $10,329,567.18 figure to which Fentress testified, but Dr. Lee's report takes no apparent account of Fentress's testimony that the figure was already calculated in "present value" dollars. Thus, the report could represent a present-value discount of an amount already substantially discounted to present value. Further, in its reasons for denying Captain D's motion for judgment as a matter of law, the district court also expressed concern regarding Dr. Lee's apparent failure to account for future inflation in medical costs, a subject about which the district court intended to question Dr. Lee. However, because Dr. Lee did not testify, the district court never received the opportunity to pose its questions, and Dr. Lee's report was not subject to cross examination.

Unable to find evidence of a compromise verdict, we affirm the district court. "In determining whether a compromise verdict exists, this court considers any indicia of compromise apparent from the record . . . ." Pagan, 931 F.2d at 339; see also 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2810 (2d ed. 2007) (stating that an alleged compromise verdict warrants a new trial only if "it is obvious from the face of the verdict that it is a compromise."). When a jury might reasonably reach an allegedly improper award based on the evidence in the record, no compromise exists. See Pagan, 931 F.2d at 339 ("No compromise exists, however, when another basis for an [allegedly] improper award exists.") (citing Hadra v. Herman Blum Consulting Eng'r, 632 F.2d 1242, 1246 (5th Cir.1980); Burger King Corp. v. Mason, 710 F.2d 1480, 1487 (11th Cir.1983)).

Here we find no indication of compromise. The jury's award of $8 million does not simply split the difference between the two amounts proposed by the opposing experts; rather, the award appears to be a reasonable calculation based on a weighing of the evidence presented by both parties. Furthermore, the jury was instructed to make a present value finding as to Foradori's future medical expenses, and we must presume that, as its verdict indicates, it did so. See United States v. Gallardo-Trapero, 185 F.3d 307, 321 (5th Cir. 1999) (assuming juries follow instructions).

In arguing to the contrary, the only evidence that Captain D's presents is the fact that the jury did not return the precise amount proposed by either expert. However, such is not a basis for error. See Garner v. Santoro, 865 F.2d 629, 644 (5th Cir. 1989) (stating that in a "battle of the experts" a jury "must be

allowed to make credibility determinations and weigh the conflicting evidence in order to decide the likely truth of a matter"). Thus, we find that the jury's award of $8 million for the present value of Foradori's future medical expenses was not an improper compromise verdict, and we affirm the district court's denial of Captain D's motion for a new trial or remittitur on the issue.

8. Past medical expenses

Captain D's challenges the jury's award of $1,581,884.41 to Foradori for past reasonable and necessary medical expenses incurred because of his quadriplegia. Captain D's argues that the district court committed reversible error by admitting Foradori's medical bills into evidence because they were inadmissible hearsay evidence under Fed. R. Evid. 801 and were not authenticated as required by Fed. R. Evid. 901. Accordingly, Captain D's asserts that it should have been granted a new trial on damages, or, alternatively, a remittitur of $1,556,840. We disagree.

On the first day of the trial, plaintiff's counsel asked Foradori if he knew how much he had incurred in medical expenses because of his quadriplegia from the date of his injury, December 22 of 2000, to the date he compiled his medical bills before the commencement of the trial on October 3 of 2005. Captain D's counsel asked for a conference outside the jury's presence. In the conference, Captain D's counsel objected to Foradori's testimony regarding his medical bills on the grounds that he lacked sufficient knowledge of them and to the introduction of Foradori's medical bills on the grounds that they were hearsay

and had not been authenticated. After further discussion, the district court overruled the objection on the grounds that under the Miss. Code Ann. § 41-9-119 Foradori was entitled to testify to the medical expenses he had incurred and to introduce the bills he had received as evidence of the expenses. However, the court informed Captain D's counsel that he would be given ample opportunity both to cross-examine Foradori regarding the expenses incurred and the bills introduced and to introduce evidence challenging the bills and Foradori's testimony.[47]

When the trial resumed the next day, Foradori testified, without objection, that as a result of his quadriplegia he had incurred over $1,556,840[48] in medical expenses for treatment and services at a number of medical institutions: North Mississippi Medical Center in Tupelo, Mississippi; Regional Medical Center in Memphis, Tennessee; Shepherd Center in Atlanta, Georgia; Atlanta Psychiatric and Neurology Clinic in Atlanta, Georgia; Kings Daughters Nursing Home in Memphis, Tennessee. He further testified that he had bills for these expenses totaling $1,556,840 and identified a binder marked Plaintiff's Exhibit P12 as containing those bills.

Based on Foradori's testimony, plaintiff's counsel offered to introduce Exhibit P12 into evidence. The court asked if there was any objection, and Captain D's counsel said: "No additional objection besides what we have

---

[47] In denying Captian D's motion for a new trial, the district court again based its ruling on Miss. Code Ann. § 41-9-119 as well as other grounds.

[48] Foradori testified that his expenses totaled $1,556,840 at the time he last compiled his bills but that he had incurred additional bills every day since then and would continue incurring bills every day.

discussed yesterday, Your Honor." The court then allowed Exhibit P12 to be entered into evidence.

Captain D's counsel did not cross-examine Foradori regarding his testimony about his medical expenses or medical bills. Nor did Captain D's introduce any contradictory evidence of its own contesting Foradori's testimony or the P12 medical bills.

The Mississippi statute referred to by the district court, Miss. Code Ann. § 41-9-119, provides: "Proof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable." Miss. Code Ann. § 41-9-119. The Mississippi Supreme Court has interpreted the statute as simplifying the procedure for proving medical expenses as an element of a claim by (1) permitting a claimant, based on his or her testimony, to identify and introduce medical bills incurred because of the illness, disease, or injury sued upon; and (2) establishing the bills so identified and introduced as prima facie evidence and a rebuttable presumption[49] that the expenses were necessary and reasonable. For example, the court has explained:

> Before the enactment of section 41-9-119, the common law was that medical expenses, where claimed as an element of damage, required proof connecting the bills for such medical expenses with

---

[49] The term "prima facie evidence" is typically understood to include a "presumption," see Black's Law Dictionary 598 (8th ed. 2004) ("prima facie evidence. Evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced"), and the Mississippi courts have construed it to have this meaning and effect. Nevertheless, to avoid any confusion we will continue to use both terms in tandem because medical bills introduced under the statute establish not only a presumption affecting the burden of producing evidence but they also constitute evidence admissible for consideration by the jury.

> the injury or disease sued on, together with proof that the charges for the medical expenses claimed were reasonable. The purpose of [Miss. Code Ann. § 41-9-119] was to simplify the procedure for proving medical expenses where claimed as an element of damages. It permits a party to introduce bills for medical expenses which have been paid or incurred, upon the testimony of the party that the bills were incurred or paid because of the illness, disease or injury sued on and makes the bills prima facie evidence that the treatment was necessary and the charges therefor were reasonable.

McCay v. Jones, 354 So. 2d 1095, 1101 (Miss. 1978) (internal citation omitted).

> When a party takes the witness stand and exhibits bills for examination by the court and testifies that said bills were incurred as a result of the injuries complained of, they become prima facie evidence that the bills so paid or incurred were necessary and reasonable. However, the opposing party may, if desired, rebut the necessity and reasonableness of the bills by proper evidence. The ultimate question is then for the jury to determine.

Jackson v. Brumfield, 458 So. 2d 736, 737 (Miss. 1984). Although Mississippi codified its common law hearsay and authenticity principles as rules of evidence, see Miss. R. Evid. 801 & 901, Mississippi courts have continued to interpret § 41-9-119 as superseding the standard hearsay and authenticity bars or conditions to admissibility, making medical bills vouched for by victims' in-court testimony not only admissible but, in combination with that testimony, prima facie evidence and a presumption of proof of that part of a victim's damages case. See Harvey v. Wall, 649 So. 2d 184, 189 (Miss. 1995) (citing Jackson, 458 So. 2d at 737); Biloxi Reg'l Med. Ctr., Inc. v. Estate of Ross, 546 So. 2d 667, 671 (Miss.

70

1989) (citing Jackson, 458 So. 2d at 737) ; Alfa Mut. Ins. Co. v. Cascio, 909 So. 2d 174, 177, 181 (Miss. App. Ct. 2005); see also Tom R. Mason, The Little Rule that Never Was: Mississippi Rule of Evidence 301 Presumptions in Civil Actions and Proceedings, 70 Miss. L.J. 743, 800 (2000) (classifying Miss. Code Ann. § 41-9-119 as an "ordinary presumption" shifting the burden of production to the defendant).

Thus, under Miss. Code Ann. § 41-9-119, when Foradori took the witness stand and exhibited his medical bills for examination by the court and testified that they were incurred as a result of the injuries complained of, they became prima facie evidence and triggered the presumption that the bills so paid or incurred were necessary and reasonable. However, Captain D's could have, if it so desired, rebutted the necessity and reasonableness of the bills by proper evidence. Had Captain D's done so, the ultimate question would then have been for the jury to determine. In this case, however, Captain D's elected not to cross examine Foradori or to introduce any rebuttal evidence.

Because Miss. Code Ann. § 41-9-119, via Federal Rule of Evidence 302, applies in this case, the district court properly admitted Foradori's medical bills, and Captain D's objection and argument to the contrary, based on Federal Rules of Evidence 803 and 901, is not well founded. Rule 302 provides that when state law supplies the rule of decision for a claim, as in this diversity case, that same state law also determines the effect of any presumption respecting a fact which is an element of the claim. Fed. R. Evid. 302; C. Mueller & L. Kirkpatrick, 1 Federal Evidence § 3:14 ("Fed. R. Evid. 302 requires federal courts to give state presumptions the same effect state law would give them . . . ."); see also Clayton

v. Burston, 493 F.2d 429, 431 (5th Cir. 1974) ("[I]n a diversity tort case the applicability of any presumption, either of negligence or due care, is governed by state law."); Barron v. Ford Motor Co., 965 F.2d 195, 198-99 (7th Cir. 1992) (noting that under Fed. R. Evid. 302, 501, and 601, the Federal Rules of Evidence apply state law "with respect to presumptions, privilege, and competency of witnesses"); 19 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 4512 (2d ed. 2007) (same). Foradori's incurrence of $1,556,840 in past medical expenses as a result of his quadriplegia is a fact which is an element of his claim, to which the law of Mississippi supplies the rule of decision. Hence, Fed. R. Evid. 302 provides that Mississippi law, not federal law, determines the effects of any state-law presumption respecting that fact. Thus, the effects of the rebuttable presumption and prima facie evidence authorized by Miss. Code Ann. § 41-9-119 are governed by Mississippi law in this diversity case rather than by Fed. R. Evid. 803 and 901. See Fed. R. Evid. 302; 21b Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5136 (2d ed. 2007).

Therefore, we conclude that the district court's ruling that Foradori was entitled to introduce his medical bills through his testimony, thereby establishing them as prima facie evidence and a presumption of reasonable and necessary medical expenses, was proper. Captain D's failed to avail itself of its right under the statute to cross-examine Foradori and to introduce rebuttal evidence challenging his past medical expenses evidence introduced in connection with plaintiff's exhibit P12. Accordingly, we find no error in the district court's admission of the evidence, or abuse of discretion in its denial of

a new trial or a remittitur, in respect to the jury's damage award of $1,556,840 in past medical expenses.

## IV. Conclusion

For these reasons, we AFFIRM the judgment of the district court.